IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 13, 2008 Session

## BOARD OF PROFESSIONAL RESPONSIBILITY v.
## EDWARD I. CURRY, III

**Appeal by Permission from the Chancery Court for Shelby County**
**No. CH-04-2127-3    W. Michael Maloan, Chancellor**

---

**No. W2006-02688-SC-R3-CV - Filed October 3, 2008**

---

This appeal involves a disciplinary proceeding against a lawyer that arises from a fee dispute. A hearing panel of the Board of Professional Responsibility suspended the lawyer for six months after determining (1) that he engaged in unprofessional conduct by placing an unauthorized endorsement on a settlement check and (2) that he had converted funds he had withdrawn from his trust account to pay his fee because he failed to return the funds after his client disputed his fee. The lawyer appealed to the Chancery Court for Shelby County. Based on the record of the proceeding before the hearing panel and additional evidence, the reviewing court reduced the six-month suspension to a public censure after determining that the hearing panel erred by concluding that the lawyer had converted his client's funds and that he was obligated to return the funds after his client disputed his fee. Disciplinary Counsel appealed to this Court. We hold that a public censure is an appropriate remedy in this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

Jesse D. Joseph, Nashville, Tennessee, for the appellant, Board of Professional Responsibility of the Supreme Court of Tennessee.

Robert L. Green and Darryl D. Gresham, Memphis, Tennessee, for the appellee, Edward I. Curry, III.

**OPINION**

**I.**

Edward Inman Curry, III has been licensed to practice law in Tennessee since 1984. He practices in Memphis where he is also a member of St. John's Episcopal Church. When the facts giving rise to this proceeding arose, Mr. Curry also served as a board member of Recovery Ministries of the Episcopal Church, Inc., a national membership organization whose mission is to address

substance abuse issues. One of his fellow board members was the Right Reverend Charles I. Jones, III, the Bishop of Montana.

On January 30, 1999, while both men were attending a Recovery Ministries board meeting in New Orleans, Bishop Jones[1] confided to Mr. Curry that he was facing disciplinary action by the Episcopal Church in the United States. The bishop's difficulties stemmed from a charge of sexual misconduct with an adult parishioner before he was elected Bishop of Montana. Bishop Jones asked Mr. Curry to represent him because he had been notified that he would be placed on trial before an ecclesiastical court.

Mr. Curry and Bishop Jones disagree regarding the terms of Mr. Curry's engagement. Bishop Jones asserts that he and Mr. Curry agreed in New Orleans that Mr. Curry would represent him for a nominal fee of one dollar plus reimbursement for Mr. Curry's out-of-pocket expenses. For his part, Mr. Curry insists that he told Bishop Jones in New Orleans that he desired to consider the matter before agreeing to represent him. Mr. Curry and Bishop Jones do, however, agree that they discussed the possibility that Mr. Curry's fee might be paid by the Diocese of Montana or the national Episcopal Church.

In early February 1999, after Mr. Curry returned to Memphis, he discussed representing Bishop Jones with the senior rector at St. John's. He expressed concern about representing Bishop Jones because he did not desire to act inconsistently with his moral obligations to the church. The rector assured him that representing Bishop Jones would not necessarily create a rift between Mr. Curry and the Episcopal Church. Following this conversation, Mr. Curry prepared and mailed an engagement letter to Bishop Jones dated February 4, 1999, stating that his fee would be calculated on an hourly basis plus expenses and that he would be entitled to one-third of any recovery Bishop Jones might receive, which would be credited against his hourly fee. If Mr. Curry's share of the recovery exceeded his hourly fee, Bishop Jones would retain the excess. However, if Mr. Curry's share of the recovery was less than his hourly fee, Bishop Jones would be personally responsible for the difference.

Mr. Curry did not expressly ask Bishop Jones to indicate his assent to the terms in the February 4, 1999 letter.[2] Bishop Jones denies that he ever received the letter.

Mr. Curry's efforts on behalf of Bishop Jones consumed a significant amount of his time over the course of the next three years. He traveled to Chicago, Illinois and Billings, Montana to negotiate a financial settlement for Bishop Jones in return for his voluntary resignation as Bishop

---

[1]Even though Bishop Jones later resigned as Bishop of the Diocese of Montana, we will refer to him as "Bishop Jones" in this opinion.

[2]Mr. Curry did not ask Bishop Jones to sign the letter to indicate his assent to the terms of representation. The Code of Professional Responsibility did not require contingency fees to be memorialized in writing. In March 2003, the Rules of Professional Conduct replaced the Code of Professional Responsibility, and with the new rules came a requirement that contingency fees be established in writing. *Compare* Tenn. Sup. Ct. R. 8, DR 2-106(B) (1999), *with* Tenn. Sup. Ct. R. 8, RPC 1.15(c) (2007). Regardless, whether or not this fee arrangement constitutes a fee contingent upon the outcome of the matter is not at issue in this case.

of Montana. He also counseled Bishop Jones regarding possible legal action against the national Episcopal Church, the Church Insurance Companies,[3] and other individuals. He also represented Bishop Jones before the ecclesiastical court. Mr. Curry periodically forwarded Bishop Jones fee and expense statements, and Bishop Jones made payments to Mr. Curry on at least five occasions prior to January 6, 2001.[4]

On February 22, 2001, shortly after the special ecclesiastical court recommended that he be defrocked, Bishop Jones reached a settlement with the Diocese of Montana. Bishop Jones agreed that he would resign as Bishop of Montana in exchange for a severance package that consisted of fifteen months' compensation – $118,859.00 – and the forgiveness of the $54,978.91 mortgage on his house which was held through the Diocese.[5] This agreement was memorialized in a February 23, 2001 letter written by Mr. Curry to representatives of the Diocese of Montana. In the letter, Mr. Curry stated his understanding that the Diocese would purchase and fund an annuity for Bishop Jones. Mr. Curry further stated, "I will have a representative from Union Central [Life Insurance Company][6] contact Jim [Hunt][7] regarding the purchase. The purchase and funding of the annuity is to be done such that the first payment from the annuity will occur on March 25, 2001."

Bishop Jones, who is also a certified public accountant, came up with the idea of using the settlement funds to purchase an annuity. He decided that he could minimize his tax obligations by having the Diocese of Montana purchase an annuity for him rather than receiving periodic cash payments from the Diocese. Although Mr. Curry and Mr. Hunt continued to discuss the settlement, they never finalized the terms of the purchase and funding of the annuity mentioned in the February 23, 2001 letter. Accordingly, in a letter dated March 19, 2001, Mr. Curry requested Mr. Hunt to mail him a settlement check for $118,859, made jointly payable to him and Union Central. Mr. Curry told Mr. Hunt that he would take care of the paperwork for the annuity through Union Central's office in Memphis and that he would then forward the paperwork to Mr. Hunt for his signature on behalf of the Diocese. On March 19, 2001, the Diocese of Montana mailed Mr. Curry a check for $118,859 made jointly payable to Mr. Curry and Union Central.

Bishop Jones was reconsidering whether he wanted to purchase an annuity from Union Central by the time Mr. Curry received the check from the Diocese of Montana. However, he was

---

[3]Bishop Jones had a policy through the Church Insurance Companies whereby attorneys fees and expenses would be covered in case of a legal or ecclesiastical proceeding. The Church Insurance Companies' position was that the policy did not cover the charge of sexual misconduct against Bishop Jones.

[4]Bishop Jones paid Mr. Curry a total of $529.45 earmarked toward repayment of Mr. Curry's expenses. He also paid Mr. Curry $4,500, including $1,500 that had been solicited from members of Bishop Jones's diocese for the explicit purpose of paying his attorney's fees.

[5]Bishop Jones had previously rejected substantially larger settlement offers that included sums specifically earmarked for the payment of his attorney's fees. The offer he accepted did not include funds earmarked for his legal expenses.

[6] We will henceforth refer to Union Central Life Insurance Company as "Union Central."

[7]Jim Hunt represented the Diocese of Montana during the negotiations.

eager to take possession of the settlement proceeds because he was concerned that the Diocese of Montana might decide to audit the diocesan accounts during his tenure. Accordingly, Mr. Curry set out to cash the settlement check and then to hold the proceeds awaiting Bishop Jones's direction.

Mr. Curry's first effort to deposit the check into his escrow account failed because the bank would not accept the check without Union Central's endorsement. On March 28, 2001, Mr. Curry discussed the matter with Richard Fisher, an agent for Union Central in Memphis, who suggested that they telephone Union Central's chief financial officer in Cincinnati to discuss how to proceed with the check. Mr. Fisher placed a telephone call to Steven Valerius. Mr. Valerius and Mr. Curry discussed the matter and agreed that Union Central had no interest in the settlement proceeds because Bishop Jones had not applied for an annuity.[8] Mr. Valerius did not, however, explicitly give Mr. Curry permission to endorse the check on behalf of Union Central. Nonetheless, following the telephone call with Mr. Valerius, Mr. Curry added the following endorsement underneath his own endorsement: "Union Central Life by EIC III per Steve Valerius, CFO Deposit Only." Then he deposited the check into his trust account. Following a telephone conversation with Bishop Jones, Mr. Curry withdrew one-third of the amount of the check as payment of his fee and deposited these funds in his personal account.

Bishop Jones remained undecided regarding the terms of the settlement and the use of the settlement funds throughout the Spring of 2001. At one point, he decided that he would prefer to refinance his house on his own and to receive as an additional settlement funds equal to the amount of his mortgage debt. He also decided that he would prefer to own the annuity himself. Bishop Jones requested Mr. Curry to disburse $5,000 of the settlement proceeds to him while he shopped around for an annuity with a more favorable interest rate. Mr. Curry forwarded Bishop Jones a check for $5,000 on April 27, 2001.

Mr. Curry kept Mr. Hunt informed of Bishop Jones's indecision regarding the settlement. In a faxed letter dated May 16, 2001, Mr. Curry informed Mr. Hunt that he had placed the initial proceeds in escrow, that Bishop Jones had received part of the proceeds, and that the final check representing the mortgage forgiveness should be made payable to "Edward I. Curry, III, Attorney for Ci Jones."[9] Mr. Hunt responded that the Diocese of Montana was agreeable to Bishop Jones's decision regarding the mortgage, as long as the Diocese could issue an IRS Form 1099 to Mr. Curry's firm reflecting the total amount of the settlement. On May 17, 2001, Mr. Curry sent another check for $2,000 to Bishop Jones at his request.

---

[8]On March 26, 2001, Bishop Jones had filled out an application for a Union Central annuity and faxed it to Mr. Curry. However, many elements of the application were left blank, including determinations as to whether the annuity would be "Qualified" or "Non Qualified"; whether or not Mr. Curry chose to have required federal taxes withheld from annuity disbursements; and the dollar amount being used to fund the annuity.

[9]The letter contains the notation "cc: Ci Jones." Bishop Jones's familiar name was "Ci Jones." Bishop Jones later testified that he "could have received this letter, but [he did not] remember receiving it" because he "would have objected strongly" to the check being made payable to Mr. Curry as his attorney. The facsimile cover sheet and the delivery confirmation appear in the record.

On May 23, 2001, the Diocese of Montana issued a check for $54,978.91 in place of the forgiveness of Bishop Jones's mortgage. Despite Mr. Curry's and Mr. Hunt's previous correspondence, the check was once again issued to Union Central and Mr. Curry. Mr. Curry endorsed the check in his own name and, on June 19, 2001, deposited it into his escrow account without any endorsement by Union Central. This time the bank accepted the check for deposit and credited Mr. Curry's trust account. After a telephone conversation with Bishop Jones, he withdrew one-third of the amount of the check and deposited the funds in his personal account as payment of his fee. On June 25, 2001, Mr. Curry disbursed $2,400 to Bishop Jones at his request. Bishop Jones was apparently still shopping for annuity interest rates at the time.

The relationship between Mr. Curry and Bishop Jones began to sour later in July 2001 after Bishop Jones asked Mr. Curry to represent him pro bono on his appeal from the decision recommending that he be defrocked as a priest. In a letter to Bishop Jones dated July 25, 2001, Mr. Curry stated: "In response to your query as to whether I would be willing to handle the appeal [of the ecclesiastical matter] on a pro bono basis . . . the answer is no. I would consider representing you . . . under the same terms and conditions as before." Included with this letter was another $5,000 disbursement of the settlement proceeds requested by Bishop Jones.

In a letter dated July 26, 2001, Mr. Curry transmitted his "final fee bill for services" to Bishop Jones. The "final fee bill for services" reflected the withdrawal of $57,945.97 for Mr. Curry's "⅓ fee," as well as the withdrawal of approximately $12,000 for expenses. Mr. Curry's letter also updated Bishop Jones regarding the status of the negotiations with the Church Insurance Companies. He concluded the letter with "I should have an interest rate for you on a fixed rate annuity within the next several days. [A Union Central representative] was somewhat surprised that you had found one at 6.00%."

On July 30, 2001, Mr. Curry sent another letter to Bishop Jones informing him that it was unlikely that the Episcopal Church would voluntarily pay for the legal expenses that Bishop Jones had incurred in the ecclesiastical proceeding. Mr. Curry also informed Bishop Jones that a resolution of his currently outstanding fees would be necessary before he would undertake to represent the bishop in his claims against the Episcopal Church. Mr. Curry stated:

> [P]rior to proceeding with these suits, we need to resolve the issue of your outstanding fee statement, since it is now apparent that neither PECUSA[10] or CIC[11] will voluntarily pay your fees and expenses (other than the small payment received from the Presiding Bishop). I forwarded a final statement to you last week and after giving you credit for all receipts and adjustments, the balance owed is $119,364.23.

---

[10]This acronym refers to the Protestant Episcopal Church in the United States of America.

[11]This acronym refers to the Church Insurance Companies.

Mr. Curry also pointed out to Bishop Jones that while he had requested payment of these bills in the past, he had not pressed the issue because of their "relationship." He concluded by suggesting that Bishop Jones contact him to set up a payment plan for the unpaid balance of his bill.

For his part, Bishop Jones wrote a letter to Mr. Curry on July 26, 2001. With the exception of the funds that had already been disbursed to him, Bishop Jones insisted that all funds received from the Diocese of Montana should be used to purchase "a fixed annuity, hopefully at six or more percent . . . beginning now on August 25, 2001." On August 4, 2001, Bishop Jones wrote Mr. Curry, acknowledging receipt of Mr. Curry's July 25, July 26, and July 30 letters. He stated, "Before we can discuss any of the issues you raise in your letter, I feel you simply must comply with our agreement regarding the annuity."

Toward the end of July 2001 – as it became evident that he and Bishop Jones were heading toward an impasse about his fee – Mr. Curry informed another lawyer, Kim Mullins, about the situation with Bishop Jones. At Ms. Mullins's suggestion, Mr. Curry and Ms. Mullins called Lance Bracy, the Board of Professional Responsibility's Chief Disciplinary Counsel, seeking informal advice. Following his conversation with Mr. Bracy, Mr. Curry placed the remaining funds from Bishop Jones's settlement – $94,491.15[12] – into a separate, interest-bearing account.

Bishop Jones filed a complaint against Mr. Curry with the Board of Professional Responsibility. He also filed suit against Mr. Curry in the Circuit Court for Shelby County. Mr. Curry filed a counterclaim against Bishop Jones for the unpaid portion of his fee. Mr. Curry and Bishop Jones eventually settled their fee dispute to Bishop Jones's full satisfaction, and the pending lawsuit was dismissed. They also informed the Chief Disciplinary Counsel that they had resolved their dispute. However, on October 29, 2002, following its own independent investigation of Bishop Jones's complaint, the Chief Disciplinary Counsel filed a Petition for Discipline against Mr. Curry. The petition alleged that Mr. Curry had agreed to represent Bishop Jones for one dollar and that he had "fraudulently converted funds he had a fiduciary responsibility to use for the agreed upon purposes to benefit his client."

One of the Board's hearing panels conducted a hearing on July 19, 2004. The evidence submitted to the hearing panel included the deposition testimony of Bishop Jones and his wife, several communicants from the Diocese of Montana, Mr. Hunt, officials from Union Central, and Bishop Jones's former lawyers. Mr. Curry and Ms. Mullins testified in Mr. Curry's defense.[13] In its August 27, 2004 order, the hearing panel declined to make factual findings regarding the terms of the fee agreement between Mr. Curry and Bishop Jones. According to the panel, "[e]ven assuming [Mr. Curry] believed there was no dispute as to the funds . . . as of July 26, 2001, he knew differently. . . . [B]y failing to replace [the funds Mr. Curry had withdrawn as a fee] once it became clear that his fee was in dispute, Curry violated [Tenn. Sup. Ct. R. 8, DR1-102(A)(1), (5), (6) and

---

[12]Only $89,491.15 of the settlement funds remained. Mr. Curry added $5,000 to these funds because he was unsure whether Bishop Jones had received the last $5,000 disbursement.

[13]Ms. Mullins gave her testimony via a teleconference.

DR9-102(A)(2)]."[14]  The hearing panel determined that Mr. Curry should be suspended from the practice of law for six months, and that, following his suspension, he should be placed on probation for six months.

Mr. Curry appealed to the Chancery Court for Shelby County.  On June 13, 2006, the court heard the matter on the record of the hearing panel's proceeding and also heard testimony from Mr. Curry and Ms. Mullins.[15]  In its October 30, 2006 amended judgment, the reviewing court adopted the panel's findings of fact.  It also determined that Mr. Curry had endorsed the settlement check without authority, thereby violating Tenn. Sup. Ct. R. 8, DR1-102(A)(1),(5), and (6).[16]  With regard to Mr. Curry's alleged violation of Tenn. Sup. Ct. R. 8, DR 9-102(A)(2), the court determined that the plain language of the rule did not require an attorney to return funds withdrawn before a fee dispute arises.  Accordingly, the court overturned the hearing panel's finding that Mr. Curry had violated Tenn. Sup. Ct. R. 8, DR 9-102(A)(2).  The court determined that Mr. Curry had neither misused nor misappropriated client funds.  After considering Mr. Curry's unblemished record to be a mitigating factor and his substantial experience in the practice of law to be an aggravating factor, the reviewing court determined that a public censure was the appropriate sanction.  The Disciplinary Counsel has appealed.

## II.

Like other cases involving disciplinary proceedings against lawyers that we have recently decided, the procedural time-line in this case straddles the former and current versions of Tenn. Sup. Ct. R. 9 § 1.3.  The current version of Tenn. Sup. Ct. R. 9 § 1.3, which took effect on July 1, 2006, contains a standard of review that differs from the previous rule.  Accordingly, we must, at the outset, choose which standard we will use to review the trial court's opinion in this case.

---

[14]At the time, Tenn. Sup. Ct. R. 8, DR 1-102(A) read:

> A lawyer shall not:
> (1) Violate a Disciplinary Rule.
>     . . .
> (5) Engage in conduct that is prejudicial to the administration of justice.
> (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

Tenn. Sup. Ct. R. 8, DR 9-102(A)(2) read:

> Funds belonging in part to a client and in part . . . to the lawyer . . . may be withdrawn [from the lawyer's insured depository account] when due unless the right of the lawyer . . . to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

[15]The court excluded testimony of an expert witness with regard to the ethical propriety of Mr. Curry's actions.

[16]Although the court referred to the unauthorized endorsement of "checks" the record demonstrates that Mr. Curry only purported to endorse for Union Central on one check.  The other check was simply missing an endorsement.

In *Board of Professional Responsibility v. Love*, 256 S.W.3d 644 (Tenn. 2008), we reviewed a proceeding involving a petition for reinstatement to the practice of law. In that case, the trial court conducted its hearing on August 9, 2006. *Bd. of Prof'l Responsibility v. Love*, 256 S.W.3d at 649. We determined that we should apply the current post-July 1, 2006 standard of review:

> Tennessee Supreme Court Rule 9, section 1.3, does not affect Love's vested rights or liabilities. To the contrary, the rule focuses only on the way in which the trial court reviews a hearing panel's decision. And because the new standard is procedural in nature and does not impair an obligation of contract, applying the new standard to *trial court proceedings conducted after its effective date* would not produce an unjust result. . . . Accordingly, we hold that the new standard of review, which became effective July 1, 2006, was applicable during the trial court's August 9, 2006 hearing.

*Bd. of Prof'l Responsibility v. Love*, 256 S.W.3d at 652 (emphasis added). Two months later, in *Hughes v. Board of Professional Responsibility*, 259 S.W.3d 631 (Tenn. 2008), we reviewed another proceeding involving a petition for reinstatement in which the trial judge was appointed and the hearing was conducted after July 1, 2006. *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d at ___.[17] This Court again applied the current standard of review. *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d at ___.[18]

In both *Love* and *Hughes*, we also cited the general principle that remedial or procedural laws apply retroactively to all actions pending when the new law took effect unless the application of the new law would produce an unjust result. *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d at ___;[19] *Bd. of Prof'l Responsibility v. Love*, 256 S.W.3d at 652. We have determined that using the current standard of review in Tenn. Sup. Ct. R. 9 § 1.3 in cases heard by a trial court before July 1, 2006 could produce unjust results.

In trial court proceedings that occurred before July 1, 2006, the lawyers prepared and presented their cases based on their understanding that the reviewing courts – both the trial court and this Court – would employ the pre-July 1, 2006 standard of review. Changing the standard of review after the lawyers have presented their cases without also giving the parties the opportunity to adjust their strategy and their proof creates the possibility that the courts will decide the case based on factors that the parties had no notice of when they presented their case. This essential unfairness can be avoided by applying the current standard of review in Tenn. Sup. Ct. R. 9 § 1.3 in cases in which the trial court hearing occurred after July 1, 2006 and by applying the pre-July 1, 2006 standard of review in cases in which the trial court hearing occurred before July 1, 2006.

---

[17]*See Hughes v. Bd of Prof'l Responsibility*, 2008 WL 2687436, at *4.

[18]*See Hughes v. Bd of Prof'l Responsibility*, 2008 WL 2687436, at *7.

[19]*See Hughes v. Bd. of Prof'l Responsibility*, 2008 WL 2687436, at *6.

In this case, unlike *Love* and *Hughes,* the trial court conducted its hearing before July 1, 2006, the effective date of the current standard of review. Our application of the pre-July 1, 2006 version of the standard of review is, therefore, consistent with our opinions in *Love* and *Hughes* and reflects the standard of review that was available to the court and parties at the time of the trial court's hearing in each of these cases.

At the time of the hearing before the trial court in this case, Tenn. Sup. Ct. R. 9 § 1.3 required that the trial court's judgment be based on the record before the hearing panel and on the additional evidence that Mr. Curry elected to present. The trial court was charged with weighing this evidence and then determining the facts by the preponderance of the evidence. Therefore, our review of the trial court's decision is de novo upon the record of the trial court, with a presumption of correctness given to the trial court's findings unless the evidence preponderates against those findings. *Milligan v. Bd. of Prof'l Responsibility*, 166 S.W.3d 665, 671 (Tenn. 2005); *Bd. of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538, 545-46, 546 n.4 (Tenn. 2004). However, when neither the hearing panel nor the trial court has made specific findings of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *See Hardcastle v. Harris*, 170 S.W.3d 67, 78-79 (Tenn. 2004); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

## III.

Despite the reticence of both the hearing panel and the reviewing court to make specific findings of fact with regard to the terms of Mr. Curry's engagement, we have determined that definitively addressing this matter is essential to a just and proper adjudication of this case. In the absence of findings by either the hearing panel or the reviewing court, we must undertake this task ourselves. Doing so in this case will not undermine the superior ability of either the hearing panel or the reviewing court to assess the credibility of the witnesses because most of the relevant evidence, with the exception of Mr. Curry's testimony, was presented in affidavits and depositions.[20]

It has been Bishop Jones's contention throughout this proceeding that even though Mr. Curry generated fee statements and forwarded them to him, the parties actually had an understanding that Mr. Curry would look only to third parties for the payment of his fee. The Board apparently took that position as well. We have determined that this version of the agreement between Mr. Curry and Bishop Jones is at odds with the evidence in the record. We begin, therefore, with an examination of the evidence concerning the February 4, 1999 fee agreement letter.

Mr. Curry testified that he prepared the February 4, 1999 engagement letter and duly mailed it to Bishop Jones. He produced a copy of this letter at trial and stated unequivocally that the letter reflected the terms upon which he agreed to represent Bishop Jones. For his part, Bishop Jones, his wife, and two of his former clerical employees denied that he received the letter, and Bishop Jones asserted that the letter produced by Mr. Curry did not reflect the parties' actual agreement.

---

[20]When evidence is presented though a deposition, the appellate courts are just as able to judge the witness's credibility as the trial court. *See Bohanan v. City of Knoxville*, 136 S.W.3d 621, 624 (Tenn. 2004); *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 784 (Tenn. 1999); *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991).

Tennessee's courts recognize the rebuttable presumption that a letter that has been properly mailed has been delivered to and received by the addressee. *Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896, 901 (Tenn. 2007); *Modern Upholstered Chair Co. v. Henry*, 213 Tenn. 475, 483, 376 S.W.2d 441, 444 (1964). To overcome this presumption, the addressee must present credible evidence of non-receipt. *See In re Adoption of S.A.W.*, No. M2007-01690-COA-R3-PT, 2008 WL 820540, at *1 (Tenn. Ct. App. Mar. 26, 2008) *perm. app. denied* (Tenn. June 23, 2008). Once rebuttal evidence is presented, the question of receipt becomes an issue of fact for the trial court to decide. *U.S. Life Title Ins. Co. of N.Y. v. Dep't of Commerce & Ins.*, 770 S.W.2d 537, 542 (Tenn. Ct. App. 1988).

While Bishop Jones insisted that he did not receive Mr. Curry's February 4, 1999 engagement letter, he conceded that he "very rarely" opened the mail delivered to his office. Two of the persons who worked in the diocesan office testified that they did not recall opening this letter and did not recall seeing it until after this dispute arose.[21] We have determined that Bishop Jones's evidence is not sufficient to rebut the presumption that Mr. Curry prepared and mailed the February 4, 1999 engagement letter and that Bishop Jones received it.

We have also determined that Mr. Curry's testimony regarding the negotiation and substance of his agreement to represent Bishop Jones is more credible than Bishop Jones's version and is corroborated by the record. Mr. Curry testified that he did not agree to represent Bishop Jones during their conversations in New Orleans because he desired to consider the matter further. He also testified that he talked with his rector about the advisability of representing Bishop Jones and that he agreed to represent Bishop Jones only after he talked with his rector. Mr. Curry's rector corroborated that this conversation occurred after Mr. Curry returned from New Orleans.

Bishop Jones's awareness of his obligation to pay attorney's fees is further buttressed by the fact that he paid Mr. Curry $4,500 in July 2000 using his personal funds and funds he had solicited from communicants in the Diocese of Montana expressly for the purpose of paying his attorney's fees. Mr. Curry's receipt of this payment was reflected in the October 31, 2000 fee statement he sent to Bishop Jones. In December 2000, Mr. Curry sent a letter to Bishop Jones reminding him of his personal obligation to pay attorney's fees.[22] In a January 21, 2001 letter to Mr. Curry, Bishop Jones stated that he was prepared to resign as Bishop of Montana if he could be assured of a disability pension and the payment of his attorney's fees.

After Bishop Jones and Mr. Curry discussed pursuing claims against the Episcopal Church, Mr. Curry told Bishop Jones in a letter dated April 27, 2001 that "rather than charging you an hourly rate of $185.00 plus expenses with credit for ⅓ of any recovery, I will handle [claims] . . . on a pure contingency basis. . . . You will be responsible for payment of . . . expenses regardless of any recovery." Additionally, in his July 25, 2001 letter to Bishop Jones, Mr. Curry specifically declined

---

[21]The testimony of Bishop Jones's wife regarding the mail received at home is irrelevant because Mr. Curry's February 4, 1999 letter was mailed to Bishop Jones's office address.

[22]Bishop Jones denied receiving this letter as well. He presented no evidence other than his testimony, however, to rebut the presumption that the letter was received upon its mailing.

to represent Bishop Jones pro bono on the appeal from the ecclesiastical court's decision to defrock him but offered to represent Bishop Jones "on the same terms and conditions as before." Finally, we note that Bishop Jones, on several occasions, made representations to church officials and communicants of the Diocese of Montana that he was encountering great personal hardship because of his escalating attorney's fees.

We are not unmindful of the evidence presented by the Board to establish its assertion that Mr. Curry agreed to represent Bishop Jones for one dollar plus expenses. This evidence includes (1) Bishop Jones's and his wife's accounts of their meeting with Mr. Curry in New Orleans on January 30, 1999, (2) the recollections of other persons who had gathered to support Bishop Jones, prior to his ecclesiastical trial on November 19, 2000 in Minneapolis, Minnesota, during which Bishop Jones publicly thanked Mr. Curry for representing him without a fee and Mr. Curry purportedly responded that "he was glad to do it," and (3) Mr. Hunt's recollection that Mr. Curry told him twice during two different telephone conversations that he was not taking a fee to represent Bishop Jones.

Mr. Curry's version of his January 30, 1999 conversation with Bishop Jones in New Orleans differs from those of Bishop Jones and his wife. Mr. Curry also testified that he did not hear Bishop Jones's comment about the one-dollar fee in Minneapolis and that, if he had, he would have responded to it at the time. Finally, Mr. Curry testified that Mr. Hunt had misconstrued his comments. He stated that on one occasion during the negotiations, he told Mr. Hunt, out of frustration with Bishop Jones, that he "would be willing to waive [his] fee just to get rid of the case." Mr. Curry also testified on another occasion that he told Mr. Hunt that the settlement should not include a separate amount for attorney's fees.

After taking the entire record into consideration, particularly the documentary evidence prepared contemporaneously with the significant events in this case and the other corroborating evidence, we have determined that the preponderance of the evidence supports a finding that Bishop Jones's engagement of Mr. Curry was based on the terms contained in Mr. Curry's February 4, 1999 letter. We have also determined that the preponderance of the evidence supports a finding that both Mr. Curry and Bishop Jones intended to seek the payment of all or part of these fees from the Diocese of Montana, the Church Insurance Companies, or the Episcopal Church and that Bishop Jones remained personally liable for the fees that were not paid by these parties. Were we to reach any other conclusion, we would be forced to conclude that Bishop Jones was actively misleading church officials and other communicants in the Diocese of Montana regarding his obligation to pay attorney's fees.

## IV.

The Board sought to discipline Mr. Curry based on his conduct with regard to the deposit of the two settlement checks from the Diocese of Montana and with regard to his withdrawal of a portion of the proceeds of these checks to pay his legal fees. The hearing panel based its decision to discipline Mr. Curry on its conclusions (1) that Mr. Curry had "converted" a portion of the settlement proceeds to his own use, (2) that Mr. Curry had failed to return the withdrawn funds to his trust account when "it became clear that the fee was in dispute," and (3) that Mr. Curry supplied

Union Central's endorsement on one of the settlement checks when he did not have actual or apparent authority to do so.

The reviewing court, after considering the evidence presented to the hearing panel and after hearing additional proof, concluded that Mr. Curry had not converted the portion of the settlement proceeds that he withdrew from his trust account and that Mr. Curry was not required to replace the funds he had withdrawn after the fee dispute arose. However, the court concurred with the hearing panel's conclusion that Mr. Curry had acted unethically by supplying Union Central's endorsement on one of the settlement checks without authority.

## A.

We turn first to Mr. Curry's actions with regard to his receipt of the settlement funds from the Diocese of Montana. Based on this record, there is no basis for concluding that Mr. Curry engaged in any misconduct with regard to Bishop Jones by receiving these funds from the Diocese and depositing them into his trust account. In fact, it is clear that Mr. Curry was following Bishop Jones's directions and was acting with Bishop Jones's full knowledge and assent.

It is undisputed that, when Mr. Curry received the first settlement check from the Diocese, Bishop Jones was attempting to minimize his tax liability and to identify an investment vehicle for the settlement funds that would yield the best return. At the same time, it is also undisputed that Bishop Jones was concerned about what an audit of the financial records of the Diocese of Montana might reveal. While Bishop Jones was reluctant to receive the settlement funds directly, he desired to make sure the funds were beyond the reach of the Diocese. Accordingly, he and Mr. Curry agreed that Mr. Curry would hold the funds "in escrow" in Mr. Curry's trust account until Bishop Jones could sort things out.

Bishop Jones was clearly aware of where the settlement proceeds were. He received periodic updates from Mr. Curry regarding the status of these funds, and on four occasions between April 27 and July 25, 2001, Mr. Curry promptly disbursed funds when Bishop Jones requested him to do so. Based on this evidence, there is no basis to conclude that Mr. Curry violated Tenn. Sup. Ct. R. 8, DR 9-102(B)(3), (4).[23]

Even though the hearing panel declined to make findings regarding the terms of Mr. Curry's engagement, we have determined that the evidence supports finding that Mr. Curry was entitled to a fee for his services to Bishop Jones based on the terms in Mr. Curry's February 4, 1999 letter. Accordingly, Mr. Curry did not convert or misappropriate funds from Bishop Jones when he withdrew $57,945.57 from his trust account to pay his fee. In addition, the evidence does not support a finding that Bishop Jones was contesting Mr. Curry's right to a fee or that Mr. Curry should have known that Bishop Jones would have objected to using a portion of the settlement

---

[23]Although neither the hearing panel nor the reviewing court determined that Mr. Curry was in violation of the provisions of the Code of Professional Responsibility, the Board contended before the hearing panel that he violated Tenn. Sup. Ct. R. 8, DR 9-102(B)(4) and, in its brief to this Court, asserted that Mr. Curry violated Tenn. Sup. Ct. R. 8, DR 9-102(B)(3) as well.

proceeds to pay his fee when he withdrew the funds to pay his fee from his trust account.[24]  Thus, Tenn. Sup. Ct. R. 8, DR 9-102(A)(2) has no application in this case.  There was no existing fee dispute when Mr. Curry withdrew the funds, and, therefore, he was not obligated to return them after a dispute subsequently arose.

## B.

The Board also asserted that Mr. Curry committed forgery when he placed Union Central's endorsement on the first settlement check and deposited the check into his trust account.  The hearing panel and the reviewing court stopped short of concluding that Mr. Curry had committed forgery but concluded that he lacked authorization to place Union Central's endorsement on the check.  Based on this finding, the hearing panel and the reviewing court concluded that Mr. Curry had engaged in conduct prejudicial to the administration of justice and in conduct that adversely reflects on his fitness to practice law in violation of Tenn. Sup. Ct. R. 8, DR 1-102(A)(5), (6).

The record shows unmistakably that Mr. Curry did not have actual or apparent authority from Union Central to affix its endorsement on the settlement check.  Even though it is plain that Union Central had no legal interest in the check, the undisputed evidence regarding the statements of the insurance company's officials cannot be construed as authorizing Mr. Curry to endorse its name on the settlement check.  Thus, the evidence supports the finding of both the hearing panel and the reviewing court that Mr. Curry affixed an unauthorized endorsement on the settlement check.

For the purpose of negotiating a check, the Uniform Commercial Code defines an "unauthorized signature" as "one made without actual, implied, or apparent authority and includes a forgery."  Tenn. Code Ann. § 47-1-201(44) (2001).  The Uniform Commercial Code does not define "forgery," and instead the courts look to the definition of the offense in the criminal code. *See McConnico v. Third Nat'l Bank*, 499 S.W.2d 874, 884-85 (Tenn. 1973).

Under current law, a person commits forgery when he or she "forges[25] a writing with intent to defraud or harm another."  Tenn. Code Ann. § 39-14-114(a).  Thus, a necessary element of the act of forgery is an intent to defraud. *State v. Rounsaville*, 701 S.W.2d 817, 819-20 (Tenn. 1985). The fact that a signature or endorsement is unauthorized does not necessarily establish it as a forgery unless there is also evidence of an intent to defraud.  1A Larry Lawrence, *Uniform Commercial Code* § 1-201:745, at 122 (3d ed. 1996).

Mr. Curry's endorsement of the settlement check does not constitute a forgery for two reasons.  First, the endorsement does not purport to be the act of Union Central; rather, it purports to be the act of "EIC III" [Mr. Curry] as an agent of Union Central.  The fact that the endorsement

---

[24]The record does not support the Board's assertion that there was a "continuing dispute from the inception of the representation regarding the right of [Mr. Curry] to withdraw any attorney fees out of Rev. Jones' settlement."

[25]The definition of "forge" in Tenn. Code Ann. § 39-14-114(b)(1)(A)(i) (2006) includes to "[a]lter, make complete, execute or authenticate any writing so that it purports to . . . [b]e the act of another who did not authorize that act[.]"

reflects that Mr. Curry was acting as an agent for a disclosed principle prevents the endorsement from being a forgery. *Mallory v. State*, 179 Tenn. 617, 624, 168 S.W.2d 787, 789 (1943) (holding that the "endorsement 'Labor Advocate, by P.T. Mallory' did not purport to be counterfeit of the name of the payee of the check"). Second, this record lacks any evidence that could support a conclusion that Mr. Curry intended to defraud the Diocese of Montana, Union Central, or Bishop Jones when he affixed Union Central's endorsement to the settlement check. Union Central had no legal claim to the proceeds of the check, and the Diocese of Montana had no interest in the ultimate disposition of the funds as long as it was released from further liability to Bishop Jones. Bishop Jones wanted Mr. Curry to take possession of the settlement proceeds and knew that Mr. Curry had deposited them into his trust account. Accordingly, we have concluded that the Board failed to prove that Mr. Curry's unauthorized endorsement of the settlement check amounts to a forgery.

## C.

Even though Mr. Curry did not commit forgery, it is clear that he placed Union Central's endorsement on the settlement check when he knew, or should have known, that he was not authorized to do so. Mr. Curry essentially misrepresented to the depository bank that he had authority to affix Union Central's endorsement to the settlement check. As a practicing commercial lawyer with over twenty years of experience, Mr. Curry should also have been aware of the complex legal consequences resulting from the negotiation of a check bearing an unauthorized endorsement. The fact that none of these consequences ultimately arose does not diminish the fact that Mr. Curry's conduct was contrary to law and that it exposed the banks that accepted and processed the settlement check to liability and loss.

We evaluate each proceeding involving the discipline of a lawyer in light of its particular facts and circumstances. *Bd. of Prof'l Responsibility v. Maddux*, 148 S.W.3d 37, 40 (Tenn. 2004); *Ramsey v. Bd. of Prof'l Responsibility*, 771 S.W.2d 116, 123 (Tenn. 1989). Penalties recommended or imposed for lawyer misconduct should also be considered in light of the American Bar Association's Standards for Imposing Lawyer Sanctions (2005) ("ABA Standards"), which the Board itself has adopted. *Bd. of Prof'l Responsibility v. Maddux*, 148 S.W.3d at 40. ABA Standards § 3.0 states that in imposing discipline after a finding of lawyer misconduct, the court should consider "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors."

Based on our review of the record, we agree with both the hearing panel and the reviewing court that Mr. Curry placed an unauthorized endorsement on the settlement check and that, under the facts of this case, this conduct violated Tenn. Sup. Ct. R. 8, DR 1-102(A)(5), (6). However, this conduct was not criminal in nature. Thus, like the reviewing court, we note that ABA Standards § 5.13 states that a "[r]eprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that reflects adversely on the lawyer's fitness to practice law." In addition, ABA Standards § 7.3 similarly provides that a "[r]eprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system."

-14-

While a reprimand is an appropriate punishment for the act that Mr. Curry committed, we must also consider any aggravating and mitigating factors that may appear in the record. *Bd. of Prof'l Responsibility v. Maddux*, 148 S.W.3d at 41. The record in this case reflects the following two aggravating factors: Mr. Curry's substantial legal experience and his refusal to acknowledge the wrongfulness of the unauthorized endorsement. ABA Standards § 9.22(g), (i). At the same time, the record reflects the following mitigating factors: the absence of a prior disciplinary record, the presence of personal problems, and Mr. Curry's character and reputation. ABA Standards § 9.32(a), (c), (g). Based on Mr. Curry's conduct and our weighing of the aggravating and mitigating factors, we concur with the trial court's conclusion that the proper penalty for Mr. Curry's unauthorized endorsement of the settlement check is a public censure in accordance with Tenn. Sup. Ct. R. 9, § 4.4.

## V.

We conclude that the public censure imposed by the reviewing court is a fair and proportionate punishment under the facts of this case. Accordingly, we affirm the judgment of the reviewing court and tax the costs of this appeal to the Board of Professional Responsibility.

_____
WILLIAM C. KOCH, JR., JUSTICE