# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
June 1, 2017 Session

## BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE v. ROBIN K. BARRY

**Direct Appeal from the
Chancery Court for Davidson County
No. 15-1270-I        Ben H. Cantrell, Senior Judge**

_____

**No.  M2016-02003-SC-R3-BP**

_____

This is an appeal from attorney disciplinary proceedings based on the attorney's knowing conversion of client funds.  In this case, disputed insurance funds were placed in the attorney's trust account pending resolution of the dispute.  Shortly after the disputed insurance funds were deposited, the attorney began to comingle funds in her trust account and use the insurance proceeds for her own purposes.  At about the time the dispute over the insurance funds was resolved, the attorney moved out of state.  In response to her client's repeated inquiries about disbursement of the client's share of the funds, the attorney stalled, made misrepresentations, and finally stopped communicating with the client altogether.  After the client filed a complaint with the Tennessee Board of Professional Responsibility against the attorney, the hearing panel found violations of RPC 1.4, RPC 1.15(a) and (d) and RPC 8.4, which included the knowing conversion of client funds and the failure to communicate.  The hearing panel found five aggravating circumstances and no mitigating circumstances.  It suspended the attorney's Tennessee law license for eighteen months, two months of which were to be served on active suspension.  After the Board appealed, the chancery court held that the hearing panel's decision was arbitrary and capricious and that disbarment was the only appropriate sanction.  The attorney now appeals to this Court, arguing that disbarment is not warranted.  In the alternative, the attorney argues that the disbarment should be made retroactive to the date of her original temporary suspension.  Under the circumstances of this case, we affirm the chancery court and disbar the attorney from the practice of law in Tennessee, and we decline to make the disbarment retroactive.

**Tenn. Sup. Ct. R. 9, § 1.3 (2006) (currently Tenn. Sup. Ct. R. 9, § 33.1(d) (2014))**
**Direct Appeal; Judgment of the Chancery Court Affirmed**

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

William W. (Tripp) Hunt III, Nashville, Tennessee,[1] for the appellant, Robin Kathleen Barry.

William Moody, Brentwood, Tennessee, for the appellee, Board of Professional Responsibility of the Supreme Court of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of disciplinary proceedings against Appellant/Respondent Robin K. Barry. Ms. Barry was licensed to practice law in Texas in 2001 and in Tennessee in 2002.[2]

This proceeding arose out of Ms. Barry's 2009 representation of Miranda Adams. At that time, Ms. Barry was a solo practitioner in Nashville, Tennessee.

As background, Ms. Barry's client, Ms. Adams, cohabited with Daniel Gill and had a child with him. Ms. Adams moved out of their home with the child and contacted Ms. Barry to represent her in legal matters against Mr. Gill.[3] To that end, in February 2009, Ms. Barry and Ms. Adams entered into a retainer agreement. Under the agreement, Ms. Adams paid Ms. Barry a $1,650 retainer, against which Ms. Barry was to bill Ms.

---

[1] The record contains both a Nashville, Tennessee address and a Forney, Texas address for Mr. Hunt.

[2] Our recitation of the facts is taken from the undisputed evidence submitted in the administrative proceedings below, which consisted of Ms. Barry's testimony and ten exhibits.

[3] Ms. Adams sought to establish Mr. Gill's paternity as to their child and to obtain a temporary restraining order against Mr. Gill.

Adams $200 per hour. The agreement required Ms. Barry to provide Ms. Adams with periodic statements.

Shortly after the legal proceedings were initiated, Mr. Gill died. This rendered moot the legal proceedings for which Ms. Barry was retained.

Other issues arose, however, that required Ms. Adams to need legal representation. The primary one was a dispute over a $100,000 life insurance policy on the life of Mr. Gill. Although Ms. Adams was the named beneficiary on the policy, Mr. Gill's former wife, Alicia Harris, claimed that she was entitled to the proceeds pursuant to a provision in her divorce decree with Mr. Gill.[4] Based on this turn of events, Ms. Barry and Ms. Adams verbally modified their retainer agreement to apply it to Ms. Barry's representation of Ms. Adams in the dispute over the insurance proceeds. Ms. Barry did not require Ms. Adams to pay her an additional retainer.

In May 2009, the life insurance company paid insurance proceeds of $100,000 to Ms. Adams. Because ownership of the funds was in dispute, Ms. Barry deposited the money into her trust account at SunTrust Bank. The money was to be held in Ms. Barry's trust account until the dispute between Ms. Adams and Ms. Harris was resolved. Immediately prior to the deposit, the balance in the trust account was $5.00, so essentially the only funds in Ms. Barry's trust account were the disputed life insurance proceeds.

Rather than simply keeping the $100,000 in the trust account for Ms. Adams, Ms. Barry used the funds for other purposes. Any effort to discern how the funds were actually used is complicated by the fact that Ms. Barry did not keep proper trust account records. The only "record keeping" done was keeping stubs from checks written on the trust account. Ms. Barry kept neither a ledger nor a journal to document the transactions in her trust account. During her testimony in the disciplinary hearing below, Ms. Barry was unable to locate her check stubs. Consequently, the primary evidence at the hearing of the activity in Ms. Barry's trust account consisted of the SunTrust Bank records for the account; these were submitted as an exhibit at the hearing and corroborated by Ms. Barry.

In her testimony, Ms. Barry said that her routine for indicating the client for whom money was being deposited or expended was to write her clients' names on trust account deposit slips or on the memo line of checks. Despite this routine, some of the deposit slips and checks on the account did not include a client name. To convey a sense of how

---

[4] Ms. Harris and Mr. Gill had a child during their marriage. The divorce decree between Ms. Harris and Mr. Gill required Mr. Gill to maintain a life insurance policy payable to Ms. Adams and Ms. Harris for the benefit of their minor children in the event of his untimely demise.

Ms. Barry utilized the trust account, we will outline the transactions in the account, as described in Ms. Barry's testimony and as evidenced in the available records.

On May 15, 2009, eleven days after depositing Ms. Adams' $100,000 in life insurance proceeds into her trust account, Ms. Barry wrote check #1058 from the account in the amount of $7,691.50 to Jennifer Duke, one of Ms. Barry's previous divorce clients. This caused the trust account balance to fall to $92,313.50. Ms. Barry could not remember why the check to Ms. Duke was written; she speculated that it was part of the distribution of a real estate transaction for Ms. Duke.[5] At the time the check was written, none of the money in the account belonged to Ms. Duke. Therefore, the $7,691.50 paid to Ms. Duke necessarily came from the money held in trust for Ms. Adams. For the next several months, Ms. Barry wrote no further checks on the trust account.

In the fall of 2009, there was more activity in the trust account. On October 20, Ms. Barry deposited $1,500.00 in cash into the trust account; the deposit slip did not have a client's name on it. Ms. Barry could not recall where the deposited cash came from or whether it related to a client.

On December 23, 2009, Ms. Barry wrote check #1061 for $264.50 to the Tennessee circuit court clerk's office. She wrote "Messick" on the memo line of the check to indicate that it was payment for the filing fee in a divorce action for another client, Mr. Messick. Ms. Barry did not know whether the $1,500 deposit made in October 2009 related to Mr. Messick. Ms. Barry made no other deposits to the trust account before she wrote check #1061 on behalf of Mr. Messick. Consequently, it appears that the check written on Mr. Messick's behalf was drawn from the funds being held in the trust account for Ms. Adams.

Over the course of the next year, Ms. Barry wrote eight checks totaling $7,150 from the trust account, all made payable to herself, that did not include a client's name on the memo line. Those eight checks were:

12/11/2009    check #1059: $1,000.00
12/17/2009    check #1060:   $600.00
01/07/2010    check #1062: $1,500.00
02/05/2010    check #1063: $1,200.00
02/12/2010    check #1064:   $300.00
04/07/2010    check #1066  $1,000.00

---

[5] Ms. Barry explained that, when the marital residence in Ms. Duke's action was sold, the proceeds should have been placed in Ms. Barry's trust account in October 2006.

07/16/2010    check #1067: $1,500.00
01/02/2011    check #1078:    $50.00

Ms. Barry testified that she did not recall why these checks were written or why she failed to put a client's name on the memo line.

There were other transactions in Ms. Barry's trust account during this same period of time. On June 30, 2010, Ms. Barry deposited $3,013.96 into the account. The deposit included $2,000 in cash and a check from Consensus Mediation Services in the amount of $1,013.96. The deposit slip did not contain a client name for the cash deposit. The check indicated on the memo line that it was for "[Rule] 31 GC training/Supplies." Ms. Barry testified that she had already earned this money by teaching and providing other related services. At the hearing, she stated that she did not know why she deposited the $3,013.96 into her trust account.

On August 4, 2010, Ms. Barry deposited a check for $1,300 from Dan Barry[6] into her trust account. The check had no notation on the memo line, and the record does not include an explanation for this check.

Approximately two weeks later, on August 19, 2010, Ms. Barry deposited $1,000 from Timmy Dawson into her trust account, comprised of a $1,500 check minus $500 in cash. The check contained the notation "lawyer fees" on the memo line. Ms. Barry wrote one check to herself, check #1076 for $750, with Mr. Dawson's name on the memo line. Because only $750 of the total $1000 deposit was spent on Mr. Dawson's behalf, it appears that $250 should have remained in Ms. Barry's trust account for the benefit of Mr. Dawson.

On September 1, 2010, Ms. Barry deposited $2,500 from Kimberly McGahey into the trust account; the check said "retainer[] fee" on the memo line. Ms. Barry wrote five checks on the trust account that had Ms. McGahey's name on the memo line. Check #1068 ($257.50) was written to the circuit court clerk for filing fees, and check #1069 ($50) was written to a process server. The other three checks—checks #1070 ($400), #1071 ($400), and #1073 ($700)—were all made payable to Ms. Barry. These five checks totaled $1,807.50 out of the $2500 retainer Ms. McGahey paid. It appears, then, that $692.50 should have remained in the trust account for the benefit of Ms. McGahey.

---

[6] The record does not indicate whether Dan Barry was a client of Ms. Barry.

As part of the same September 1, 2010 deposit, Ms. Barry deposited another check from Consensus Mediation Services into the trust account, this one in the amount of $1,340.37, less $340.37 taken in cash. The memo line on the check read "[Rule] 31 TRNG thru 8-28-10." Ms. Barry testified that this also was a check for fees she had already earned. Consequently, there was apparently no reason to deposit those monies in a trust account.

The next month, on October 8, 2010, Ms. Barry deposited a $1,000 check from Chad Charles into her trust account. This check included the notation "legal services" on the memo line.[7] Ms. Barry testified that this check was a retainer for legal services she provided to Mr. Charles. Ms. Barry wrote three checks from the trust account, made payable to herself, with the notation "Charles" on the memo line. These three checks totaled $1,600: checks #1072 ($600), #1075 ($500), and #1077 ($500). The amounts expended on Mr. Charles' behalf exceeded the amount deposited by $600. Apparently, then, Ms. Barry used $600 in trust account funds for the benefit of Mr. Charles that may have belonged to Ms. Adams or other clients.[8]

In early 2011, Ms. Adams and Ms. Harris reached a settlement in their dispute over the life insurance proceeds deposited into Ms. Barry's trust account. Around the same time, in early March 2011, Ms. Barry moved to Texas and began practicing law there. Despite the move, Ms. Barry continued to represent Ms. Adams in her settlement with Ms. Harris. Ms. Barry did not tell Ms. Adams that she had moved to Texas.

On March 28, 2011, Ms. Adams and Ms. Harris executed a settlement agreement on the disputed funds. Under the settlement, the parties agreed that Ms. Harris was entitled to $95,000 out of the $100,000 in insurance proceeds being held in the trust account. Just before the agreement was signed, however, Ms. Barry's trust account balance was only $92,055.46. On February 24, 2011, to cover the required $95,000 check, Ms. Barry deposited $3,000.50 (a $3,462.50 less $462 in cash) into the trust account.[9] The deposit was a check from client Lisa Chamberlain, bearing the notation

---

[7] The deposit for Mr. Charles was for the gross amount of $2,000, but Ms. Barry took $1,000 in cash from the deposit.

[8] By that point, however, Ms. Barry had also comingled in the trust account monies that were apparently not being held in trust, namely, over $4,000 in payment from Consensus Mediation Services for services she had already rendered.

[9] At the discipline hearing, Ms. Barry agreed that she "had to [comingle these funds] to be able to pay the [$95,000] settlement to [Ms. Harris]."

"attorney fees" on the memo line. Ms. Barry said that these were likely earned fees for work she had performed for Ms. Chamberlain. Pursuant to the settlement agreement, on March 24, 2011, Ms. Barry wrote check #1079 to Ms. Harris's attorney in the amount of $95,000. By the time the check cleared a few days later, the trust account had an ending balance of $80.58.[10]

On April 22, 2011, Ms. Barry wrote check #1080 to herself for $75. Ms. Barry wrote "Adams" on the memo line of this check. She explained at the disciplinary hearing that she wrote the $75 check to "empt[y] out" her trust account because she had moved to Texas and did not intend to continue practicing law in Tennessee.

Around the time Ms. Adams and Ms. Harris executed the settlement agreement on the disputed life insurance funds, Ms. Adams and Ms. Barry exchanged a series of emails regarding the $5,000 balance that should have been in Ms. Barry's trust account. On March 22, 2011, before the agreement was executed, Ms. Barry emailed Ms. Adams and attached the proposed settlement agreement for her review. In Ms. Adams' reply, she asked Ms. Barry about court costs and when the balance of the funds would be distributed to her. On the same day, Ms. Barry responded by telling Ms. Adams that she would send her the "remaining funds" after court costs were paid. In her email, Ms. Barry assured Ms. Adams that the money was "in my trust account." However, when Ms. Barry wrote that email, the balance in her trust account was only $55.96.

The next month, on April 14, 2011, Ms. Adams emailed Ms. Barry again to ask when she would receive the remaining funds held in trust. Ms. Barry replied that same day; she told Ms. Adams that she would send her copies of all relevant documents, but she was waiting to receive the court cost bill before sending Ms. Adams the remaining funds.

Over a month later, on June 2, 2011, Ms. Adams emailed Ms. Barry again, inquiring about when Ms. Barry would send her the balance of the funds. Ms. Barry did not respond until June 18, 2011. In her email, Ms. Barry explained to Ms. Adams that she had received the court cost bill but was waiting for the court order closing the estate, so "then I can do the accounting and refund you the balance." This statement was a misrepresentation, however, because the order closing the estate was entered on June 8,

---

[10] The $80.58 consisted of the $55.96 balance at the end of March 2011 plus interest earned on the account.

- 7 -

2011, ten days before Ms. Barry's email to Ms. Adams. At the time of Ms. Barry's response, the balance in the trust account was only 96¢.[11]

On August 30, 2011, having heard nothing in the interim, Ms. Adams emailed Ms. Barry again. She told Ms. Barry that she had tried multiple times to contact her, by email and by telephone, with no success. Ms. Adams implored Ms. Barry to contact her about the remaining balance due her from the funds held in trust. Ms. Barry did not respond.

After that, Ms. Adams discovered that Ms. Barry had moved to Texas and was practicing law there.[12] Ms. Adams left a voicemail message at Ms. Barry's new place of employment. On October 25, 2011, after receiving Ms. Adams' voicemail message, Ms. Barry replied by email. Ms. Barry told Ms. Adams that she moved to Texas for family reasons, had taken a job working for someone else, and was "trying to wrap up all my TN cases/business from" Texas. She promised Ms. Adams that she would "make a point this weekend to get [Ms. Adams file out of storage] so we can finish this up." Ms. Barry gave Ms. Adams a cell phone number and asked Ms. Adams to refrain from calling her at work. Despite her assurances to Ms. Adams, Ms. Barry made no attempt to contact her again.

Over a year went by. On November 7, 2012, Ms. Adams made one last attempt to contact Ms. Barry by email regarding the funds due her. Ms. Barry testified at her disciplinary hearing that she did not reply to this email. Ms. Barry admitted that she had "no good explanation for" her failure to contact Ms. Adams again.

The record indicates that Ms. Barry performed a significant amount of work for Ms. Adams. Despite this, Ms. Barry never sent Ms. Adams a periodic statement or a bill. She never provided Ms. Adams an accounting for the money held in trust, as required by their retainer agreement.

Her efforts to get the remaining insurance funds frustrated, on May 22, 2013, Ms. Adams filed a complaint against Ms. Barry with the Tennessee Board of Professional Responsibility ("the Board"). Notably, Ms. Adams' complaint did not criticize Ms. Barry's representation of her. Ms. Adams' main complaint was Ms. Barry's failure to

---

[11] The record reflects no activity on the account after that date.

[12] Ms. Adams discovered that Ms. Barry was living in Texas when she contacted the Tennessee Board of Professional Responsibility about Ms. Barry's conduct.

communicate with her at the conclusion of her representation and Ms. Barry's failure to disburse to her the funds due from the life insurance proceeds. In her complaint, Ms. Adams recounted that Ms. Barry had estimated that Ms. Adams should expect to receive about $4,500 after the deduction of costs and fees from the remaining $5,000 in insurance proceeds.

Ms. Barry did not respond to Ms. Adams' complaint to the Board. Consequently, on August 6, 2013, the Board temporarily suspended Ms. Barry from practicing law in Tennessee.

The suspension apparently prompted action by Ms. Barry. On September 3, 2013, Ms. Barry submitted a response to Ms. Adams' disciplinary complaint. In her response, Ms. Barry summarized her representation of Ms. Adams by explaining that, after Mr. Gill's death, she agreed to assist Ms. Adams with the "unique issues" of her circumstances, such as the disputes over the life insurance proceeds and over Mr. Gill's personal property. Ms. Barry attached to her response a timesheet that detailed the time she expended in legal service to Ms. Adams from February 2009 through March 2011.[13] According to Ms. Barry, she "expended at least 32.6 hours, resulting in attorney's fees of $6,520.00," plus $325 in expenses, for a total of $6,845. Given the $1,650 retainer Ms. Adams had paid, plus the $5,000 of Ms. Adams' insurance proceeds purportedly left in the trust account, Ms. Barry asserted that she did "not believe Ms. Adams [is] entitled to a refund of any monies."

After considering Ms. Adams' complaint and Ms. Barry's response, the Board authorized the filing of formal proceedings. On June 27, 2014, the Board filed the instant complaint against Ms. Barry, alleging several violations of the Rules of Professional Conduct based on Ms. Adams' complaint. An amended petition was filed on January 7, 2015. On February 6, 2015, Ms. Barry filed an answer to the amended petition.

Approximately two months prior to the scheduled disciplinary hearing, Ms. Barry paid Ms. Adams $5,000.

---

[13] This is the only document in the appellate record indicating the amount of work Ms. Barry performed for Ms. Adams. It is undisputed that Ms. Barry did not provide Ms. Adams with statements or any other accounting of the legal work she performed for Ms. Adams. The timesheet was not submitted as an exhibit at Ms. Barry's disciplinary hearing.

The disciplinary hearing was conducted before the hearing panel on September 30, 2015. Ms. Barry represented herself at the hearing. The sole witness at the hearing was Ms. Barry; her testimony serves as the basis for the undisputed facts recounted above.

After the Board's attorney questioned Ms. Barry, she gave her own statement. Ms. Barry's statement took a different tack than was taken in her written response to Ms. Adams' complaint. Rather than defend her actions with Ms. Adams, Ms. Barry explained to the hearing panel that she had never before practiced law on her own and was not familiar with running a business. She said that she did not "recognize how important it was to maintain contact with [her] clients [and] be diligent about record keeping and bookkeeping." That inexperience combined with unidentified personal challenges at that time, Ms. Barry said, created a situation that was "too much for [her] to handle." Ms. Barry explained that she moved from Tennessee to Texas in order "to rectify [her] personal situation" and to get "away from the circumstances [she] was in."

In Texas, Ms. Barry testified, she was working with a partner and doing "everything completely differently" than she did before, maintaining contact with clients and employing a case management system to handle her trust accounts. Ms. Barry acknowledged that she had not communicated well with Ms. Adams. She said that she "should have gotten a second [retainer] agreement" from Ms. Adams and recognized "that's my fault that I didn't." Ms. Barry told the hearing panel that she had learned from her mistakes and had "taken steps to make sure that my failures don't happen again."

The Board submitted ten exhibits at the hearing, including the SunTrust Bank trust account documents. The exhibits also included a record of Ms. Barry's disciplinary history, which consisted of one private formal admonition issued in June 2010 for lack of diligence in representing a client (RPC 1.3) and failing to adequately communicate with that client (RPC 1.4).

On October 8, 2015, the hearing panel issued its written decision.[14] Based on the above facts, it determined that Ms. Barry had committed the following ethical violations:

---

[14] The hearing panel applied the 2006 version of Tennessee Supreme Court Rule 9 because the matter was initiated before January 1, 2014, when comprehensive changes to Rule 9 became effective. *See Garland v. Bd. of Prof'l Responsibility*, No. E2016-01106-SC-R3-BP, 2017 WL 3440558, at *4 (Tenn. Aug. 10, 2017) ("Cases initiated before the effective date are governed by the pre-2014 version of Rule 9."). The parties do not dispute that this is the applicable version of the Rule. Accordingly, citations in this opinion to Rule 9 are to the 2006 version of the Rule unless otherwise noted.

1. Violation of RPC 1.15[15] (Safekeeping Property and Funds) and RPC 8.4(c) (Misconduct—dishonesty, fraud, deceit, or misrepresentation) by knowingly converting property of Ms. Adams by distributing $7,691.50 to Ms. Duke from the funds held in trust for Ms. Adams;

2. Violation of RPC 1.15(a) (Safekeeping Property and Funds—commingling) and RPC 8.4(c) (Misconduct—dishonesty, fraud, deceit, or misrepresentation) by distributing $7,150 to herself from the funds held in trust for Ms. Adams; in doing this, Attorney knowingly converted client property, causing injury to Ms. Adams;

3. Violation of RPC 1.15(a) (Safekeeping Property and Funds—commingling) by depositing earned fees from Ms. Chamberlain and Consensus Mediation Services into the trust account, commingling her own funds with those of her clients;

4. Violation of RPC 1.15(d) (Safekeeping Property and Funds—prompt distribution) by failing to promptly distribute the balance of the $100,000 after payment of the settlement and failing to provide Ms. Adams with an accounting of the funds; and

5. Violation of RPC 1.4 (Communication) by failing to adequately communicate with Ms. Adams after her move to Texas.

The hearing panel found that the Board had established those violations by a preponderance of the evidence. The hearing panel also found the presence of five aggravating circumstances:

a. Attorney had a prior disciplinary offense;

b. Attorney has shown a dishonest or selfish motive;

c. Attorney has shown a pattern of misconduct;

d. Attorney has committed multiple offenses;

---

[15] The hearing panel did not identify which subsection of RPC 1.15 was violated by this conduct.

e. Attorney has substantial experience in the practice of law, having been licensed since 2001.

The hearing panel made no findings as to any mitigating factors.

In determining an appropriate punishment, the hearing panel noted the Board's recommendation that Ms. Barry be disbarred, in accordance with the American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards"). ABA Standard 4.11 states: "Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." The panel rejected the Board's recommendation, however, and determined that suspension, rather than disbarment, was appropriate under the circumstances. It entered a judgment finding that Ms. Barry should be suspended from the practice of law in Tennessee for eighteen months, with the first two months to "be served on active suspension prospectively. The suspension shall not be retroactive."[16] The remaining sixteen months of suspension were to be served on probation pursuant to Rule 9, section 8.5, on the condition that Ms. Barry commit no further ethical violations and that she have a practice monitor to supervise her client communications and trust account management.

The Board timely filed a petition for certiorari in the Davidson County Chancery Court ("trial court") challenging the hearing panel's decision.[17] It argued that disbarment was the only appropriate punishment under the circumstances.[18]

The trial court agreed with the Board. It held that the hearing panel's findings of fact, as well as the five aggravating circumstances, were supported by substantial and material evidence. The trial court noted that the hearing panel found no mitigating circumstances.

After considering the record, the trial court held that the hearing panel's decision was arbitrary and capricious and that Ms. Barry should be disbarred. The trial court reasoned:

---

[16] By the time of its October 2015 decision, Ms. Barry had been suspended from the practice of law in Tennessee for over two years. During that entire time, however, she was practicing law in Texas.

[17] This Court appointed Senior Judge Ben H. Cantrell to hear the case in the trial court.

[18] It is unclear whether the trial court conducted a hearing in the matter. If a hearing was conducted, there is no transcript of it in the appellate record.

The ABA standards are not absolute. . . . [T]hey are guideposts. But this Court has difficulty finding any authority for imposing a sanction less than disbarment when the lawyer knowingly converts client funds causing injury to the client without any mitigating factors and a finding of five aggravating factors.

The Court finds the cavalier treatment of Ms. Adams the most troubling. By moving to Texas without informing Ms. Adams and avoiding her inquiries for years, it seems that Ms. Barry had decided to stonewall Ms. Adams in the hope that Ms. Adams would just go away.

. . . .

The Court concludes that the panel acted arbitrarily and capriciously by failing to consider and apply the ABA Standards in light of the undisputed facts. Based on this record, the only appropriate sanction is disbarment.

Thus, the trial court found that, although the hearing panel referenced the ABA Standards in its decision, it failed to consider them, as required under Tenn. Sup. Ct. Rule 9. Ms. Barry now appeals to this Court. *See* Tenn. Sup. Ct. R. 9, § 1.3 (now Tenn. Sup. Ct. R. 9, §33.1(d) (2014)).

### STANDARD OF REVIEW

"The Supreme Court of Tennessee is the source of authority of the Board of Professional Responsibility and all its functions." *Mabry v. Bd. of Prof'l Responsibility*, 458 S.W.3d 900, 903 (Tenn. 2014) (citing *Brown v. Bd. of Prof'l Responsibility*, 29 S.W.3d 445, 449 (Tenn. 2000)); *see also Nevin v. Bd. of Prof'l Responsibility*, 271 S.W.3d 648, 655 (Tenn. 2008); *Brown*, 29 S.W.3d at 449. It is our solemn duty to regulate the practice of law in the State of Tennessee. Doing so includes enforcement of the rules of the legal profession. *Mabry*, 458 S.W.3d at 903 (citing *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 470 (Tenn. 2003)). "In furtherance of this duty, we have established a system where attorneys charged with disciplinary violations have a right to an evidentiary hearing before a hearing panel, which must determine the disciplinary penalty." *Bd. of Prof'l Responsibility v. Cowan*, 388 S.W.3d 264, 267 (Tenn. 2012) (citing Tenn. Sup. Ct. R. 9, § 8.2); *see also Napolitano v. Board of Prof'l Responsibility*, 2017 WL 2265593, at *11 (Tenn. May 24, 2017).

- 13 -

"A lawyer dissatisfied with a hearing panel's decision may prosecute an appeal to the circuit or chancery court and then directly to this Court, where our review is upon the transcript of the record from the trial court, including the record of the evidence presented to the hearing panel."[19] *Walwyn v. Bd. of Prof'l Responsibility*, 481 S.W.3d 151, 162 (Tenn. 2015) (citing Tenn. Sup. Ct. R. 9, § 1.3). In reviewing the decision of a disciplinary hearing panel, this Court employs the same standard of review as the trial court; we may not reweigh the evidence or substitute our judgment for that of the hearing panel. *Napolitano*, 2017 WL 2265593, at *11; *Long v. Bd. of Prof'l Responsibility*, 435 S.W.3d 174, 178 (Tenn. 2014); *Moncier v. Bd. of Prof'l Responsibility*, 406 S.W.3d 139, 150 (Tenn. 2013) (citing *Cowan*, 388 S.W.3d at 267). Under Rule 9, § 1.3, a reviewing court may reverse or modify a hearing panel's decision only under specific circumstances:

> The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the panel's findings, inferences, conclusions[,] or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 1.3. As in all cases, we review questions of law de novo with no presumption of correctness. *Cowan*, 388 S.W.3d at 267 (citing *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 612 (Tenn. 2010)).

## ANALYSIS

In the instant appeal, Ms. Barry argues that, in reversing the decision of the hearing panel and entering a judgment of disbarment, the trial court erroneously substituted its judgment for that of the hearing panel. She does not deny that she commingled personal funds with the funds held in trust in her trust account, nor does she deny that she failed to pay Ms. Adams the remaining $5,000 in a timely manner and failed to communicate with her. Ms. Barry argues, however, that the trial court failed to

---

[19] The reviewing court may take additional proof "[i]f allegations of irregularities in the procedure before the panel are made." Tenn. Sup. Ct. R. 9, § 1.3. No such allegations were made in this case.

identify any of the five bases for reversal listed in Rule 9, section 1.3. For this reason, she contends, the trial court's reversal of the hearing panel's decision was improper. She further argues that the trial court failed to recognize comparable Tennessee cases holding that disbarment is not the only appropriate sanction for trust fund violations. Given the overall circumstances of this case, Ms. Barry maintains, the trial court's "insistence upon [] disbarment was arbitrary and excessive" and should be reversed.

In response, the Board argues that the trial court was correct in holding that the hearing panel's decision not to impose disbarment was arbitrary and capricious. It first points out that Supreme Court Rule 9 mandates consideration of the ABA Standards in imposing sanctions. It argues that ABA Standard 4.11 makes disbarment the baseline sanction in this situation, where the attorney converted client funds, had several aggravating factors, and the hearing panel found no mitigating factors. Emphasizing the lack of mitigating factors, the Board insists that disbarment is the only appropriate sanction.

The Board correctly notes that Tennessee Supreme Court Rule 9 specifically requires the hearing panel to consider the applicable ABA Standards when determining the proper discipline in a given case. Tenn. Sup. Ct. R. 9, § 8.4 (now § 15.4(a)) ("In determining the appropriate type of discipline, the hearing panel shall consider the applicable provisions of the *ABA Standards for Imposing Lawyer Sanctions*"); *see Walwyn*, 481 S.W.3d at 166; *Sneed*, 301 S.W.3d at 617. The Board has adopted the ABA Standards for disciplinary matters. *Bd. of Prof'l Responsibility v. Maddux*, 148 S.W.3d 37, 40 (Tenn. 2004). Likewise, this Court "turn[s] to the ABA Standards for Imposing Lawyer Sanctions" in assessing the appropriate discipline to be issued in a given case. *Bailey v. Board of Prof'l Responsibility*, 441 S.W.3d 223, 232 (Tenn. 2014) (citing Tenn. Sup.Ct. R. 9, § 8.4; and *Maddux v. Bd. of Prof'l Responsibility*, 409 S.W.3d 613, 624 (Tenn. 2013)); *Lockett v. Bd. of Prof'l Responsibility*, 380 S.W.3d 19, 26 (Tenn. 2012). The ABA Standards are designed to promote: "(1) consideration of all factors relevant to imposing the appropriate level of sanction in an individual case; (2) consideration of the appropriate weight of such factors in light of the stated goals of lawyer discipline; [and] (3) consistency in the imposition of disciplinary sanctions." ABA Standard 1.3. The ABA Standards provide "guideposts" for attorney discipline but are not considered "rigid rules that dictate a particular outcome." *Hyman v. Bd. of Prof'l Responsibility*, 437 S.W.3d 435, 447 (Tenn. 2014); *see Napolitano*, 2017 WL 2265593, at *16; *Bd. of Prof'l Responsibility v. Reguli*, 489 S.W.3d 408, 424 (Tenn. 2015); *Lockett*, 380 S.W.3d at 26.

Under ABA Standard 3.0, in deciding the severity of the discipline to impose, the hearing panel should consider four factors: "(a) the duty violated; (b) the lawyer's mental

- 15 -

state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." The ABA Standards set forth a number of aggravating and mitigating factors to consider in determining the appropriate sanction. *See* ABA Standard 9.22 (aggravating); ABA Standard 9.32 (mitigating). Generally speaking, "[t]he ABA Standards suggest the appropriate baseline sanction, and aggravating and mitigating factors may justify an increase or reduction in the degree of punishment to be imposed." *In re Vogel*, 482 S.W.3d 520, 534 (Tenn. 2016) (citing *Maddux*, 148 S.W.3d at 41); *see also* ABA Standard 9.21 ("[A]ggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed."); ABA Standard 9.31 ("[M]itigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed."). The ABA list of aggravating and mitigating factors is "illustrative rather than exclusive"; this Court has recognized that "the purpose of the ABA Standards is to 'promote . . . consideration of *all factors* relevant to imposing the appropriate level of sanction in an individual case.'" *Lockett*, 380 S.W.3d at 28.

In arguing that disbarment is the only appropriate discipline for Ms. Barry, the Board relies on the ABA Standards that relate to an attorney's "failure to preserve the client's property." Those Standards provide:

Absent aggravating or mitigating circumstances, upon application of the factors set out in 3.0, the following sanctions are generally appropriate in cases involving the failure to preserve client property:

4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

4.13 Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.

4.14 Admonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.

- 16 -

As can be seen, "the severity of the presumptive sanction varies depending upon the lawyer's mental state—whether the lawyer acted intentionally, knowingly, or negligently—and the seriousness of the actual or potential injury caused by the lawyer's misconduct." *Maddux*, 409 S.W.3d at 624. The presumptive sanction is most severe if the attorney "knowingly converts" client property, less severe if the attorney knowingly "deal[s] improperly" with client property, and the least severe for the attorney who is merely negligent. *See In re Vogel*, 482 S.W.3d at 535 n.16 (discussing the difference between a knowing violation and a negligent one). The severity of the presumptive sanction also increases if the attorney's actions cause the client to suffer actual injury, as opposed to little or no actual or potential injury. *See id*. at 535 n.17 (discussing the difference between injury and potential injury).

In the instant case, the hearing panel found, and Ms. Barry does not dispute, that she *knowingly converted* Ms. Adams' funds by distributing $7,691.50 to Ms. Duke and $7,150 to herself from the funds held in trust for Ms. Adams and that these actions caused actual injury to Ms. Adams. The record indicates that Ms. Barry intermittently replaced some of the disputed insurance funds before it was time to disburse them, but she never had sufficient funds in the trust account to disburse the $5,000 in remaining insurance proceeds to Ms. Adams. Regardless of the amount converted, the record contains substantial and material evidence to support the hearing panel's conclusion that Ms. Barry knowingly converted Ms. Adams' funds, and in doing so she caused actual injury to Ms. Adams.

Because the hearing panel found that Ms. Barry knowingly converted her client's funds and caused injury to her client, the ABA Standard that should be considered is Standard 4.11. It states: "Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." Under this ABA Standard, then, the baseline sanction for Ms. Barry's offenses is disbarment. *See id*. at 534-38 (looking to applicable ABA Standard for the baseline sanction).

Having found the baseline sanction to be disbarment, we next consider any aggravating or mitigating circumstances. *See id*. at 538. The hearing panel found the presence of five aggravating circumstances: Ms. Barry had a prior disciplinary offense; showed a dishonest or selfish motive; showed a pattern of misconduct; committed multiple offenses; and had substantial experience in the practice of law. Ms. Barry does not challenge the hearing panel's finding on these five aggravating circumstances.

The hearing panel did not make any findings regarding mitigating circumstances in Ms. Barry's case. Despite this fact, in her appellate brief, Ms. Barry claims that the

record demonstrates the existence of some mitigating factors in this case. She points out that her disciplinary history was minor, that she did not deny her guilt at the hearing, that she cooperated during the administrative process, that she has demonstrated remorse, and that she has made restitution. *See* ABA Standard 9.32 (listing mitigating factors). However, the hearing panel was apparently not persuaded to find any mitigating circumstances, and the record demonstrates the likely reason. We agree with Ms. Barry that her prior disciplinary history is not overly serious, but it is exacerbated by the temporary suspension imposed when she initially failed to respond to Ms. Adams' complaint. Only after Ms. Barry learned of her suspension did she respond to the complaint. In her response, instead of taking responsibility, Ms. Barry contested her guilt and asserted that she had earned the $5,000 in retained funds as a fee. This is neither an admission of guilt nor cooperation. Furthermore, although Ms. Barry eventually paid restitution to Ms. Adams, the payment came over two years after the amount was due—after Ms. Adams tracked down Ms. Barry in Texas and not long before the disciplinary hearing. Under all of these circumstances, we are not persuaded by Ms. Barry's argument that we should find significant mitigating circumstances when the hearing panel did not.

Thus, we have established that the baseline sanction in this case is disbarment, that there are significant aggravating circumstances, and that the record supports the hearing panel's decision not to find any significant mitigating circumstances. Without elaborating on its reasons, the hearing panel declined to disbar Ms. Barry and instead imposed a prospective eighteen-month suspension. Coupled with the temporary suspension that preceded this sanction, under the hearing panel's decision, Ms. Barry would have been suspended from the practice of law in Tennessee for a total of approximately three and a half years, all while she continued to practice law in Texas. The trial court, on the other hand, looked at the undisputed facts, the aggravating circumstances, and the lack of any mitigating circumstances and held that "the only appropriate sanction is disbarment."

As noted above, Ms. Barry argues that comparable Tennessee cases hold that disbarment is not the only appropriate sanction for trust fund violations. Although a review of comparable cases in Tennessee reveals a range of sanctions imposed for the misappropriation of client funds, "[t]he sanctions imposed are typically lengthy suspensions or disbarment."[20] *Lockett*, 380 S.W.3d at 29 (citing *Threadgill v. Bd. of*

---

[20] For more serious transgressions, disbarment has been found appropriate. *Skouteris v. Bd. of Prof'l Responsibility*, 430 S.W.3d 359, 370-71 (Tenn. 2014) (upholding disbarment, even though attorney insisted that his conversion of client funds "was limited to trivial accounting errors"); *Rayburn v. Bd. of*

- 18 -

*Prof'l Responsibility*, 299 S.W.3d 792, 810-12 (Tenn. 2009)). To counter Ms. Barry's argument on comparable cases, the Board asks us to consider cases from other jurisdictions to support its assertion that disbarment is the only appropriate remedy when an attorney knowingly converts a client's funds to his or her own use.[21] *See Maddux*, 148 S.W.3d at 40 (noting parties' reliance on cases from other jurisdictions when case was "first of its kind in Tennessee").

Clearly, "there are widely varying degrees of misappropriation of funds . . . . In our view, the objective of achieving uniformity of punishment in disciplinary proceedings does not require that every named offense be accorded identical punishment. Like murder in the first degree, lawyer misappropriation of funds is subject to more than one punishment." *Bd. of Prof'l Responsibility v. Bonnington*, 762 S.W.2d 568, 570-71 (Tenn.

---

*Prof'l Responsibility*, 300 S.W.3d 654, 664 (Tenn. 2009) (upholding disbarment when attorney "knowingly and repeatedly deprived his clients of funds to which they were entitled"). In other circumstances, suspension has been imposed rather than disbarment. *Napolitano*, 2017 WL 2265593, at *18-19 (upholding five-year suspension when attorney misappropriated client funds); *Flowers v. Bd. of Prof'l Responsibility*, 314 S.W.3d 882, 901-02 (Tenn. 2010) (upholding one-year suspension and requirement of restitution when attorney misappropriated client funds and finding ABA Standard 4.12 to be applicable); *Bd. of Prof'l Responsibility v. Allison*, 284 S.W.3d 316, 327 (Tenn. 2009) (upholding sixty-day suspension, with a one-year period of monitoring, when attorney misappropriated client funds; finding ABA Standard 4.12 to be applicable); *Nevin v. Bd. of Prof'l Responsibility*, 271 S.W.3d 648, 658 (Tenn. 2008) (upholding six-month suspension when attorney misappropriated client funds and finding ABA Standard 4.12 and 4.42 to be applicable); *Milligan v. Bd. of Prof'l Responsibility*, 166 S.W.3d 665, 673 (Tenn. 2005) (ordering two-year suspension for misappropriation of funds when hearing panel ordered disbarment and chancery court reduced sanction to public censure, citing ABA Standards 5.11 and 5.12). In a few cases, public censure has been deemed appropriate. *See, e.g., Long*, 435 S.W.3d 174, 181 (Tenn. 2014) (upholding public censure when attorney failed to deposit a fee into his trust account, failed to refund unearned fees, and failed to provide an accounting); *Bd. of Prof'l Responsibility v. Curry*, 266 S.W.3d 379, 381 (Tenn. 2009) (reversing panel's sanction of six-month suspension and affirming trial court's public censure when attorney did not convert or misappropriate client funds).

[21] For example, the Board cites *People v. Young*, 864 P.2d 563, 564 (Colo. 1993) ("When a lawyer knowingly converts client funds, disbarment is 'virtually automatic,' at least in the absence of significant factors in mitigation."); *In re Adams*, 579 A.2d 190, 191 (D.C. 1990) ("In virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence."); *Carter v. Ross*, 461 A.2d 675, 676 (R.I. 1983) ("We . . . are convinced that continuing public confidence in the judicial system and the bar as a whole requires that the strictest discipline be imposed in misappropriation cases."); *In re Discipline of Johnson*, 48 P.3d 881, 885 (Utah 2001) (holding that, in cases involving misappropriation of client funds, a downward departure from the presumptive sanction of disbarment is only appropriate when the lawyer demonstrates "truly compelling mitigating circumstances").

- 19 -

1988).  "We evaluate each proceeding involving the discipline of a lawyer in light of its particular facts and circumstances."  *Curry*, 266 S.W.3d at 394 (citing *Maddux*, 148 S.W.3d at 40).

The facts of this particular case present a close question.  Ms. Barry's disciplinary history prior to her representation of Ms. Adams is significant but not alarming.  Ms. Barry's initial comingling of funds in her trust account, while serious, seems more bungling than nefarious.  Her behavior progressed, however, to conduct even more concerning.  Ms. Barry persisted in misappropriating funds from the trust account.  Later, in response to Ms. Adams' multiple inquiries, she repeatedly misrepresented to Ms. Adams that she had the remaining funds for her in safekeeping and would distribute them to her when the case was over.  In reality, without informing Ms. Adams, Ms. Barry had already moved to Texas to start a new law practice there, and there were essentially no funds in the trust account whatsoever.  Finally, Ms. Barry simply stopped responding, even after Ms. Adams tracked her down in Texas.  As noted by the trial court, at some point, Ms. Barry apparently decided to stonewall Ms. Adams in the hopes that she "would just go away."  In this way, Ms. Barry sought to keep the funds that rightfully belonged to Ms. Adams.  In the disciplinary proceedings, Ms. Barry offered little excuse or explanation for her actions.

We recognize that our standard of review of the hearing panel decision is limited. However, under the facts of this case, we agree with the trial court that the hearing panel's decision must be deemed arbitrary or capricious.  Generally, "the presumptions in [the] ABA Standards . . . apply in the absence of aggravating and mitigating circumstances." *Talley v. Bd. of Prof'l Responsibility*, 358 S.W.3d 185, 194 (Tenn. 2011) (citing ABA Standards, §§ 5.1, 5.11, 5.12).  The hearing panel here offered no explanation for its decision not to impose the presumptive sanction under the applicable ABA Standard, disbarment.  Moreover, its findings provide no insight and offer no basis for the decision to suspend Ms. Barry instead of disbarring her.  The hearing panel clearly did not accept Ms. Barry's argument that she was simply an incompetent businessperson; it concluded that Ms. Barry's mental state was intentional—knowing conversion of Ms. Adams' funds.  We defer to its assessment of Ms. Barry's mental state and credibility on those issues.  *See Lockett*, 380 S.W.3d at 24.  The hearing panel also found that Ms. Adams suffered actual injury from Ms. Barry's actions.  It found no less than five aggravating circumstances.  Under the evidence presented, the hearing panel might have found some mitigating circumstances, but it found none.  Its decision to impose suspension instead of disbarment seems at odds with its factual findings and its assessment of Ms. Barry's level of intent and culpability.

We are "reluctant to impose a hard and fast rule that disbarment must follow in every case of embezzlement or defalcation by an attorney. Nevertheless, there is hardly any misconduct less tolerable or excusable on the part of a lawyer than to embezzle funds of a client." *Bonnington*, 762 S.W.2d at 571-72 (Harbison, C.J., dissenting) (noting that no mitigating circumstances were shown in the case). "We do not administer the sanction of disbarment lightly; we understand its devastating effects on an attorney. However, we are charged with protecting the public and the legal system of our state from those attorneys who do not abide by their professional responsibilities, and we cannot tolerate the intentional misappropriation of a client's funds." *In re Discipline of Johnson*, 48 P.3d at 886. We must agree with the trial court that the suspension imposed by the hearing panel is at odds with its factual findings in this case and that disbarment is warranted.

As an alternative argument, Ms. Barry contends that, should this Court agree with the trial court's imposition of disbarment, we should make the disbarment retroactive to August 6, 2013, the date Ms. Barry's law license was temporarily suspended. The effective date of disbarment affects the date on which Ms. Barry becomes eligible to reapply for reinstatement of her Tennessee law license. *See* Tenn. Sup. Ct. R. 9, § 19.2 (stating a disbarred attorney "may not apply for reinstatement until the expiration of at least five years from the effective date of the disbarment").

In oral argument to this Court, counsel for the Board argued that Ms. Barry waived any retroactivity argument because she did not argue for retroactivity until her appeal to this Court. We disagree. In the proceedings before the hearing panel, Ms. Barry sought to avoid disbarment altogether, and her arguments persuaded the hearing panel to impose only suspension, so there was no judgment of disbarment at that juncture. In the Board's appeal, Ms. Barry contended that the trial court should affirm the suspension imposed by the hearing panel. This time her arguments did not succeed; the trial court entered the judgment of disbarment that Ms. Barry now appeals. Ms. Barry was not required to propose in advance of the trial court's judgment that any disbarment, if imposed, should be made retroactive to the date of her temporary suspension. Under these circumstances, the question of retroactivity of the disbarment was not waived. *See Hornbeck v. Bd. of Prof'l Responsibility*, No. M2016-01793-SC-R3-BP, 2018 WL ---, slip op. at 13 (Tenn. Feb. XX, 2018). Therefore, we will consider Ms. Barry's argument that her disbarment should be made retroactive to the date of the temporary suspension of her Tennessee law license.

"[A] license to practice law in this state is not a right, but a privilege." *Sneed*, 301 S.W.3d at 618 (citing *Milligan v. Bd. of Prof'l Responsibility*, 301 S.W.3d 619, 630

(Tenn. 2009)). "'The license to practice law in this State is a continuing proclamation by the Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the Court.'" *Cowan*, 388 S.W.3d at 272 (quoting Tenn. Sup. Ct. R. 9, § 3.1). As we stated in *Hornbeck*: "While the attorney disciplinary process is punitive in some respects, its purpose is to safeguard the administration of justice, protect the public from the misconduct or unfitness of members of the legal profession, and preserve the confidence of the public in the integrity and trustworthiness of lawyers in general." Slip op. at 14-15 (citing ABA Standard 1.1).

In *Hornbeck*, we explained that disbarment and suspension of an attorney's law license are two wholly distinct remedies. *Id*. at 15. With suspension, the lawyer remains a member of the bar but is temporarily prevented from exercising the privileges associated with his or her law license. "Suspension specifically contemplates that, once the conditions imposed under the suspension are met, the attorney will be permitted to return to law practice." *Id*.

Disbarment, however, is not a temporary state. It "terminates the individual's status as an attorney." *Id*. (quoting Tenn. Sup. Ct. R. 9, § 12.1 (2014)). "The purpose of disbarring an attorney is to remove from the profession a person who has proven to be unfit or unworthy of being entrusted with the duties and responsibilities accorded to those who have gained the privilege of a law license." *Id*. In contrast to suspension, disbarment "does not contemplate that the disbarred attorney will return to the practice of law" in Tennessee.[22] *Id*.

Although Tennessee permits a disbarred attorney to apply for reinstatement of his or her law license, the possibility of reinstatement "does not transform disbarment into a temporary suspension of the license to practice law. Regardless of any hope of reinstatement, disbarment means that the individual has been expelled from the bar in Tennessee and his license to practice law in this State has been terminated." *Id*.

In this appeal, Ms. Barry claims that "[t]he failure to make this date retroactive would be unfair and unjust" because a prospective disbarment order would effectively

---

[22] As noted in *Hornbeck*, the "difference between suspension and disbarment is reflected in the Tennessee Supreme Court's Rules regarding the two forms of discipline." Slip op. at 15. Under the current version of Rule 9, the possibility of retroactivity is included in the rules on suspension, but the possibility of retroactivity is not mentioned in connection with disbarment. *Id.*; *see* Tenn. Sup. Ct. R. 9, § 12.2 (2014) (suspension); *id.* § 12.1 (disbarment).

prevent her from seeking "reinstatement until 10 years have elapsed since her law license was suspended." Appellant's Brief at p. 12. We see no unfairness. As noted in *Hornbeck*, any lawyer facing disbarment "has the right to participate in the appeal process set forth in the Tennessee Supreme Court Rules." Slip op. at 16 (citing applicable version, Tenn. Sup. Ct. R. 9, § 1.3 (2006), and current version, Tenn. Sup. Ct. R. 9, § 33 (2014)). "However, the disbarment does not go into effect until after the entry of this Court's order, which is delayed while the appeal is ongoing. Thus, participation in the appeal process necessarily postpones the date on which the disbarred attorney becomes eligible to apply for reinstatement."[23] *Id.* at 16-17 (citations and footnote omitted). Consequently, in deciding whether to accept disbarment or file an appeal, "[t]he delay in eligibility for reinstatement must be factored into the lawyer's calculus." *Id.*

"It is by no means a pleasant duty to enter a decree of disbarment." *State v. Bomer*, 162 S.W.2d 515, 521 (Tenn. 1942). We decline to make Ms. Barry's disbarment retroactive to the date of her temporary suspension. Pursuant to the version of Rule 9 that is applicable in this case, Ms. Barry's disbarment will be effective 10 days after entry of this Court's order of disbarment. *See* Tenn. Sup. Ct. R. 9, § 18.5 (2006). *But see* Tenn. Sup. Ct. R. 9, § 28.1 (2014) (providing that, for cases initiated after the effective date of the new Rule 9, "[o]rders imposing disbarment . . . are effective upon entry").

## CONCLUSION

In sum, we affirm the trial court's decision and conclude that the hearing panel acted arbitrarily and capriciously by failing to impose the presumptive sanction in ABA Standard 4.11, namely, disbarment, in light of Ms. Barry's knowing conversion of client funds, her other ethical violations, the finding of five aggravating circumstances, and the absence of any mitigating circumstances. We decline to make Ms. Barry's disbarment retroactive to the date of the temporary suspension of her law license.

---

[23] As noted in *Hornbeck*, there are "extremely limited instances," not applicable here, in which the Court may choose to make disbarment retroactive. Slip op. at 16 n.21.

- 23 -

For the foregoing reasons, the judgment of the chancery court is affirmed, and Ms. Barry is disbarred from the practice of law in Tennessee, which disbarment is to be effective ten days after the entry of this Court's disbarment order. *See* Tenn. Sup. Ct. R. 9, § 18.5. Costs in this appeal are to be taxed to Appellant Robin K. Barry and her surety, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE