IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 6, 2021

## TYREE B. HARRIS, IV v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Circuit Court for Davidson County**
**No. 19C1717      William B. Acree, Jr., Senior Judge**

_____

### No. M2020-01113-SC-R3-BP

_____

In this appeal from attorney disciplinary proceedings, the hearing panel found that the attorney's testimony about his income in a juvenile court proceeding to reduce his child support obligation violated Tennessee Supreme Court Rule 8, RPC 8.4(c). The hearing panel said that the attorney's answers were carefully crafted to give the appearance of literal truth but were in fact dishonest in that they intentionally omitted relevant information fairly called for in the questions. The hearing panel found that the presumptive sanction was disbarment, but it reduced the sanction to a one-year suspension in light of the attorney's prior unblemished forty-year legal career. The attorney appealed the hearing panel's decision to the circuit court, which affirmed. The attorney now appeals to this Court. He maintains that, in context, his answers were truthful and responsive to the specific questions asked, and that there was no violation of the Rules of Professional Conduct. He also contends that the sanction imposed by the hearing panel is overly harsh and an abuse of discretion. We affirm the trial court's judgment upholding the hearing panel's decision.

**Tenn. Sup. Ct. R. 9, § 33.1(d);**
**Judgment of the Circuit Court Affirmed**

HOLLY KIRBY, J., delivered the opinion of the court, in which ROGER A. PAGE, C.J., and, SHARON G. LEE and JEFFREY S. BIVINS, JJ., joined.

Tyree B. Harris, IV, and Katherine A. Brown, Nashville, Tennessee, for the Appellant, Tyree B. Harris, IV.

James W. Milam, Brentwood, Tennessee, for the Appellee, Board of Professional Responsibility.

# OPINION
## FACTUAL AND PROCEDURAL BACKGROUND

The respondent attorney in this case, Appellant Tyree B. Harris, IV, has been licensed to practice law in Tennessee since 1970. Pursuant to Tennessee Supreme Court Rule 9, § 33.1(d), he appeals the discipline imposed by a hearing panel of the Tennessee Board of Professional Responsibility ("BPR" or "Board"). The discipline at issue arises out of testimony Mr. Harris gave during child support proceedings. The child support testimony related to a client fee that had been the subject of a prior dispute between Mr. Harris and his former law firm. We will briefly summarize both the law firm dispute and the child support proceedings in order to address the discipline imposed.[1]

## Law Firm Dispute

In 2010, Mr. Harris was a partner in the three-member Nashville law firm of Willis & Knight, PLC. In May of that year, the firm received a client fee payment of $336,857.57. The client disputed a portion of the fee, so the firm kept the entire fee payment in its escrow account pending resolution of the dispute.

Ordinarily, the firm placed such fees in an operating account used to pay the firm's rent and other overhead costs. After covering those expenses, the firm would allocate any remaining funds to the designated capital accounts of individual partners, including Mr. Harris. Each of the three individual partners could then make cash withdrawals to pay personal expenses, thereby reducing his or her individual capital account balance. Among Mr. Harris's personal expenses was a child support obligation. He authorized the firm to send periodic checks directly to the child's mother and charge those amounts against his capital account balance.

By January 2011, the law firm resolved the fee dispute with its client and was ready to distribute the funds from the escrow account. Meanwhile, relations between the partners had become strained, in part because Mr. Harris believed he was bearing a disproportionate share of the firm's costs. The events that followed were a departure from the firm's usual practice regarding client fees, and Mr. Harris and another lawyer in his firm told somewhat differing versions of what happened.

---

[1] Our summary is based on the record of this case, which includes a four-volume administrative record that was sealed for reasons that are not apparent from the record. To resolve Mr. Harris's appeal, it is necessary for us to describe some of the proceedings in the sealed record, so the record is deemed unsealed to the extent we describe it in this opinion.

As outlined above, the firm's usual practice was to first deposit funds in the operating account, pay firm expenses, and then allocate any remaining funds to partners' individual capital accounts. According to Mr. Harris, he and two other members of the firm decided by a 2-1 vote to bypass the operating account entirely and distribute the partners' shares of the fee from the escrow account directly to each individual partner. Pursuant to this plan, on January 31, 2011, Mr. Harris directed the firm's bookkeeper to prepare three checks from the escrow account, one for each partner in the amount of his or her share of the fee. Mr. Harris's check was for $225,000. Once he received the check from the firm's bookkeeper, he deposited it into a separate personal savings account.

The law firm sued Mr. Harris in the Chancery Court for Davidson County. The complaint asserted, among other things, that Mr. Harris converted some or all of the $225,000. In the litigation, Mr. Harris testified about the purported 2-1 vote to bypass the firm's operating account and distribute the client fee directly to the partners. One of the firm's partners disputed Mr. Harris's testimony and maintained there was never a vote to bypass the firm's operating account.

The chancery court tried the case in 2015 and found that Mr. Harris's testimony about the purported vote was not credible. It held him liable to the law firm for conversion, intentional misrepresentation, misrepresentation by concealment, fraud, and breach of fiduciary duty. The court awarded the firm compensatory and punitive damages along with costs and fees. *See Knight v. Harris*, No. M2016-00909-COA-R3-CV, 2018 WL 372211, at *3 (Tenn. Ct. App. Jan. 11, 2018), *perm. app. denied*, (Tenn. May 17, 2018).

On appeal, the Court of Appeals mostly affirmed the chancery court's findings. However, it reversed the chancery court's award of punitive damages on the basis that the record lacked clear and convincing evidence that Mr. Harris had fraudulent intent when he converted his share of the disputed client fee. *Id.* at *10–11.

### Child Support Proceedings

Meanwhile, in September 2010, while the disputed client fee was still being held in the law firm's escrow account, Mr. Harris petitioned the Juvenile Court of Davidson County to reduce his child support obligation.[2] In the petition, Mr. Harris claimed his income had decreased. The petition was pending in January 2011, when Mr. Harris

---

[2] Mr. Harris had previously filed at least four such requests since the child was born in 1996.

received his $225,000 share of the disputed law firm fee and deposited it into his personal account.

The juvenile court scheduled its hearing on the child support modification petition for April 1, 2011. About a week before the hearing, and a day before Mr. Harris's scheduled deposition, the juvenile court conducted a telephonic hearing to address discovery obligations. The court ordered Mr. Harris to produce his tax returns and the law firm's profit-loss statements dating back to 2007.[3]

At Mr. Harris's deposition, counsel for the child's mother asked Mr. Harris about his income, his capital account, and checks from his law firm. As detailed below, Mr. Harris's responses did not disclose the fact that he had received and deposited into his personal savings account a $225,000 check from the firm's escrow account.

Specifically, Mr. Harris was first asked about his law firm capital account:

Q. Is that something that you as a partner at a law firm would be concerned about, the value of your capital account?

A. It allows me to draw.

Q. Okay. And so that means you get to get money out of the law firm?

A. Yes.

Q. Okay. And when it's zero, like it is now - - or below zero like it is now, what does that - - what effect does that have on you?

A. I have not drawn anything from the firm with the single exception of my child support. I have not drawn a penny from Willis & Knight, PLC, in the last five months.

Q. Okay. And - -

---

[3] In his subsequent disciplinary hearing, Mr. Harris testified that, when the juvenile court considered his previous child support modification petitions, it typically evaluated them by using a two or three-year average of income as reflected on his tax returns.

A. I'm sorry, four months.

Q. All right.

A. Four months.

Shortly after, Mr. Harris was asked about checks from the firm:

Q. Okay. Are there - - is there a record of the checks that you've received from the firm from 2007 until present?

A. My tax returns.

Q. No, no, that's not what I'm asking. I'm asking for a record that shows how much - - how many checks were written to you and how much they were for from the firm. Does that record exist?

A. I don't believe so.

Q. Okay.

A. I can't say that it doesn't, but I don't believe that it does, because you're - - the only thing I get is a draw, and I take the draw and that's it. . . .

. . . .

Q. Okay. The information I want is from 2007 until present, any check that has been written by the law firm to you. You have the ability to get that for me, don't you?

A. I guess I probably could. I would have to get the cancelled checks. I don't know where the cancelled checks are. I mean, all I can do is ask.

At the child support modification hearing a week later, Mr. Harris offered similar testimony about his capital account, the firm's income, and his income:

Q: Mr. Harris, have you taken a draw since the first of the year?

A: No. (Pause). Technically I have. The court ordered me to continue to pay the full amount of the child support except for the month of March, and because the firm writes a check and charges it against my capital account, that check has continued to [the child's mother], so technically, I have taken a draw to the extent that I have paid the capital account, but in no other way have I.

[The Court]: Just so I make sure I understand, you are saying that the only draw you have taken has been child support.

A: Yes, Your Honor. And that is a check that is written by the firm to . . . the mother.

Mr. Harris also testified about the firm's profit and loss statements, but he did not disclose the large client fee the firm received in May 2010 and distributed to the partners a few months before the hearing:

Q: With respect to the firm's income for January and February, what are the total collections then?

[The Court]: About $66,000.

A: I believe your Honor is correct. If you want me to add them, I will.

[The Court]: The figures are – it is $34,605 and $31,611 – that's $36,200 [sic], somewhere in that range.

Q: What have the total expenses been?

A: Right at $59,000.

Q: And again, your share of the profit would be what?

A: Would be 50 percent. There is one thing about the collections . . . .

[Opposing Counsel]: Objection, there is no question on the table.

[The Court]: Sustained.

Q: Is there anything you would like to tell the court, about, additional, about the collections?

A: . . . [T]hese numbers, the collection numbers almost certainly will not be as great.

Finally, counsel for the child's mother asked Mr. Harris directly about his income. Mr. Harris responded:

Q: So you testified that you have made really no money other than the child support draws in 2011, is that correct?

A: I didn't say I made no money. I made modest money.

Q: Modest money, you don't know what it is do you?

A: For 2011, in the two months that are there, there is approximately $7,500 in profit.

Q: $7,500 in two months?

A: Yes.

At one point during the hearing, Mr. Harris's attorney sought to introduce into evidence a spreadsheet on the law firm's capital accounts. Mr. Harris testified there was a figure on the spreadsheet that was "under discussion." The child's mother's attorney objected to this testimony and the spreadsheet because, in his deposition, Mr. Harris had not said anything about issues regarding the firm's capital accounts that were "under discussion." The juvenile court judge granted the objection and disallowed the spreadsheet exhibit and the line of questioning.

In sum, in response to questions about his income, his capital account, checks he had received from the firm, and the firm's collections, Mr. Harris did not disclose the $225,000 check from the law firm he had deposited into his personal savings account. Based on Mr. Harris's testimony, the juvenile court found that Mr. Harris's income was reduced and cut his required monthly child support payment roughly in half, by over $1,000 per month.

- 7 -

Later, the child's mother apparently became aware of the law firm dispute and filed a motion to reinstate the prior amount of child support. Her counsel contended that Mr. Harris's prior testimony to the juvenile court was untruthful because he had received the $225,000 check from his law firm by the time of his juvenile court testimony but did not disclose it. In January 2012, the juvenile court held a hearing on the motion but deferred ruling on it until resolution of the law firm dispute about the $225,000 check.

Several months later, but long before resolution of the law firm dispute, the child's mother died in a car accident. The maternal grandmother assumed custody of Mr. Harris's child. The record does not include any ruling by the juvenile court on the mother's motion to reinstate Mr. Harris's prior child support obligation.

The law firm dispute concluded years after the child's mother died.

### Disciplinary Hearing

On May 8, 2017, the BPR filed a petition for discipline against Mr. Harris. The petition alleged he violated Tennessee Supreme Court Rule 8, RPC 8.4[4] by 1) converting funds from his law firm and concealing that conversion from his partner; and 2) giving false testimony in connection with his child support modification proceedings. On February 6, 2019, a hearing panel designated by the BPR held an evidentiary hearing on the petition. Mr. Harris appeared as the sole witness.

---

[4] In relevant part, Rule 8.4 states:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice . . . .

- 8 -

As to the allegation that Mr. Harris violated RPC 8.4 by converting funds from his law firm and concealing the conversion from his law partner, the Board presented no direct evidence. Relying instead on the doctrine of non-mutual collateral estoppel,[5] the Board contended that the Court of Appeals decision, which affirmed the chancery court's conclusion that Mr. Harris had converted the law firm's funds, was sufficient basis for the panel to find a violation of RPC 8.4.

The hearing panel rejected this argument. It held that, although the Court of Appeals decision established Mr. Harris's conversion of funds, the fact of conversion alone did not demonstrate the sort of "dishonesty, fraud, deceit, or misrepresentation" necessary to establish a violation of RPC 8.4. As a result, the hearing panel concluded that the Board did not prove the first alleged violation. The Board did not appeal the hearing panel's determination on this allegation, and it is not at issue in this appeal.

The allegation that Mr. Harris violated RPC 8.4 by giving false testimony in the child support modification proceedings is a different story. The Board submitted into evidence transcripts of the testimony Mr. Harris gave in his deposition and at the juvenile court hearing. The Board emphasized: 1) the questions Mr. Harris was asked; 2) the undisputed fact that, at the time of his testimony, Mr. Harris had deposited a $225,000 check from his law firm into a personal savings account; and 3) Mr. Harris's failure to disclose the existence of the check in either his deposition testimony or his juvenile court testimony. Noting that Mr. Harris was asked direct questions about his income and his draws from the law firm, the Board argued his testimony amounted to aggravated perjury, which it defined as "testimony of a material matter with the intent to deceive while under oath in a formal proceeding." In addition, the Board pointed out, Mr. Harris refused to acknowledge his wrongdoing. The Board maintained that Mr. Harris's conduct seriously adversely reflected on his fitness to practice law, and it asked the hearing panel to disbar him.

In his testimony before the hearing panel, Mr. Harris insisted that, in context, the answers he gave during his deposition and juvenile court testimony were truthful and responsive to the specific questions asked. He said he did not view the $225,000 check as

---

[5] Under the doctrine of non-mutual collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States.*, 440 U.S. 147, 153 (1979) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979); Austin Wakeman Scott, *Collateral Estoppel by Judgment*, 56 Harv. L. Rev. 1, 2–3 (1942); Restatement (Second) of Judgments § 68 (Am. L. Inst. Tentative Draft No. 4, 1977)).

a "draw," *i.e.*, income, because he was holding the funds in a separate bank account until he learned how much of the fee he owed the law firm for expenses.

Mr. Harris also maintained that he intended to testify about the check in the juvenile court proceeding and in fact tried to do so. In support of this claim, Mr. Harris's attorney read into the record the transcript of the exchange in juvenile court in which she sought to introduce into evidence a spreadsheet reflecting the law firm's capital accounts. In the transcript, the attorney asked Mr. Harris about figures on the spreadsheet that were "in dispute," and Mr. Harris said the spreadsheet had "a figure" that was "under discussion." Alluding to this transcribed testimony, Mr. Harris explained to the hearing panel that the $225,000 check was "the dispute" in the capital accounts on the spreadsheet he was referencing. He claimed he was "about to share" and "was going to tell" the juvenile court judge about the $225,000 disputed check when the mother's attorney objected to the spreadsheet. Mr. Harris said: "I was about to testify about it. And it wasn't us who brought – said, 'Well, wait a minute. That's not relevant.' We brought it up. It was [mother's] attorney who objected to it. And I was instructed not to answer it, and so I didn't." Mr. Harris insisted he did not intentionally withhold information about the $225,000 check from either mother's counsel or the juvenile court. He denied the allegation outright, saying "the suggestion that I was trying to hide anything is absolutely without any basis in fact."

The hearing panel rejected Mr. Harris's argument, concluding instead that he had engaged in "intentional omissions designed to conceal relevant information fairly called for in the questions." Explaining its reasoning, the hearing panel first observed that, once Mr. Harris deposited the $225,000 check into his bank account, "he exercised control over those funds . . . and had the power to spend or save as he chose." The panel then spelled out how Mr. Harris's answers to questions during his deposition were misleading:

> In his deposition, Mr. Harris was asked about his capital account for 2007, which led to a discussion of the capital account as a source for a "draw." When asked if a "draw" meant "you get to get money out of the law firm," Mr. Harris agreed: "Yes." He then testified that, "I have not drawn anything from the firm with the single exception of my child support. I have not drawn a penny from [his law firm] in the last five months" – later corrected to four months. Those adjacent answers, read together, would suggest to an objective observer that Mr. Harris had no opportunity "to get money out of the law firm" in the prior four months, that is, since November 25, 2010. His testimony was that, during that period, "I have not drawn a penny from [the law firm]."

- 10 -

The hearing panel was unmoved by Mr. Harris's explanation that the $225,000 was not a "draw" because he was holding it subject to resolution of the law firm dispute about expenses. It characterized his answer as a "type of hair-splitting which falls well short of 'the truth, the whole truth, and nothing but the truth' required of witnesses under oath."

The hearing panel found Mr. Harris's answers during his juvenile court testimony were similarly misleading:

> When questioned by the [juvenile court judge] about any draw he had taken, Mr. Harris testified that it was limited to the child support checks sent directly to his former wife. Again, it strains credulity that an experienced and accomplished lawyer could understand that question to apply to a "draw" only in the most narrow and idiosyncratic sense and to exclude any inquiry about the $225,000 residing in his bank account. Certainly, few sincere laypersons would apply such an interpretation. Again, the appearance is of an answer carefully drafted to aim for literal truth in only the narrowest sense, while omitting key information highly relevant to the issues before the Court. While such conduct may or may not constitute the crime of perjury, intentional omissions designed to conceal relevant information fairly called for in the questions is "conduct involving dishonesty, fraud, deceit, or misrepresentation."

Thus, the hearing panel concluded that Mr. Harris's testimony in the child support proceeding violated RPC 8.4(c).

To determine the appropriate sanction for Mr. Harris's violation, the hearing panel considered the American Bar Association Standards for Imposing Lawyer Sanctions.[6]

---

[6] "In determining the appropriate type of discipline, the hearing panel shall consider the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions." Tenn. Sup. Ct. R. 9, § 15.4(a). In particular, the hearing panel discussed ABA Standard 3.0:

> In imposing a sanction after a finding of lawyer misconduct, courts should consider the following factors:
>
> (a) the duty violated;
> (b) the lawyer's mental state;
> (c) the potential or actual injury caused by the lawyer's misconduct; and
> (d) the existence of aggravating or mitigating factors.

Based on ABA Standards 6.1 and 6.11,[7] the panel concluded disbarment was the appropriate baseline sanction. The hearing panel found that Mr. Harris's selfish motive and substantial experience in the practice of law were aggravating factors but that the absence of any prior disciplinary history over Mr. Harris's forty-year legal career represented a significant mitigating factor. Weighing these factors, the hearing panel concluded that Mr. Harris's long legal career with no discipline outweighed the aggravating factors and justified a reduction from the presumptive sanction of disbarment. The hearing panel also noted that Mr. Harris was over seventy years old, legally blind, and had effectively retired. Based on all of these circumstances, the hearing panel suspended Mr. Harris from the practice of law for one year.

## Circuit Court Appeal

Pursuant to Tennessee Supreme Court Rule 9, § 33.1(a), Mr. Harris appealed the decision of the hearing panel to the Davidson County Circuit Court, where the case was assigned to Senior Judge William B. Acree, Jr. Mr. Harris represented himself at the hearing in the trial court.[8]

Responding to questions from the trial judge, Mr. Harris confirmed that, at the time of his juvenile court testimony, neither the juvenile court nor opposing counsel had any document reflecting the $225,000 payment, and neither he nor his attorney informed the

---

[7] These Standards provide:

6.1 False Statements, Fraud, and Misrepresentation

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:

6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

[8] Because of Mr. Harris's sight impairment, the attorney who represented him before the hearing panel assisted him in the circuit court by reading excerpts from his prior testimony, but she did not argue on his behalf.

juvenile court judge about the $225,000.  He reiterated his previous explanation that opposing counsel's objection prevented him from doing so.  Mr. Harris noted that the juvenile court had relied in the past on his tax returns to determine his income for child support purposes.

In his testimony to the trial court, Mr. Harris maintained that he was asked in the juvenile court proceedings only about his "draw" from the law firm.  He characterized the $225,000 as a "distribution" rather than a draw and said he was never asked about distributions.  The trial court asked: "What would somebody have had to ask you to make you reveal that $225,000?  What would have been a proper question?"  Mr. Harris answered that he "[a]bsolutely" would have mentioned the $225,000 had he been asked whether the law firm had made a "distribution" to him.  The trial court asked him directly: "You are contending in your appeal that you did not violate the Code of Professional Conduct, that what you did was not a violation of conduct. . . . That's correct?" When Mr. Harris replied "Yes," the trial court summed up: "You didn't do anything wrong," to which Mr. Harris responded: "Yes, sir."

The trial court took the matter under advisement.  In its subsequent decision, the trial court rejected Mr. Harris's rationale for why his testimony did not violate the ethics rules:

> Repeatedly calling the $225,000 fee a "distribution" as opposed to a "draw" does not adequately explain why Mr. Harris did not disclose, at some point during the entire child support modification proceeding, that he had $225,000 in his personal savings account. . . .
>
> Even if the Court finds Mr. Harris's $225,000 fee was not a "draw," but a "distribution," the Court finds that Mr. Harris had a duty to disclose the distribution.  The very nature of a child support modification hearing centers around income, and the Court agrees with the Disciplinary Panel that an experienced and accomplished lawyer should know better than to omit information highly relevant to the issues before a court.

The trial court concluded that Mr. Harris violated RPC 8.4(c).  Considering the sanction, the trial court stated: "While it may be argued that a one-year suspension is overly severe under the facts and circumstances of this case, this Court cannot substitute its judgment for that of the Hearing Panel as to the weight of the evidence on questions of fact."  For that reason, the trial court held that the hearing panel's decision was supported by substantial

- 13 -

and material evidence and was neither arbitrary nor capricious and affirmed as to the rule violation and the sanction.

Mr. Harris now appeals to this Court.

## STANDARD OF REVIEW

The Supreme Court of Tennessee "is the source of authority of the Board of Professional Responsibility and all of its functions." *Hornbeck v. Bd. of Pro. Resp.*, 545 S.W.3d 386, 394 (Tenn. 2018) (quoting *Rayburn v. Bd. of Pro. Resp.*, 300 S.W.3d 654, 660 (Tenn. 2009)). It is our solemn duty to regulate the practice of law in the State of Tennessee and enforce the rules of the legal profession. *Bd. of Pro. Resp. v. Barry*, 545 S.W.3d 408, 420 (Tenn. 2018).

To do so, the Court has established a system in which "attorneys charged with disciplinary violations have a right to an evidentiary hearing before a hearing panel, which must determine the disciplinary penalty." *Id.* (quoting *Bd. of Pro. Resp. v. Cowan*, 388 S.W.3d 264, 267 (Tenn. 2012)). A respondent attorney who is not satisfied with the decision of the hearing panel may appeal to the circuit or chancery court, whose review is upon the transcript of the record from the hearing panel.[9] *Id.*

If the respondent lawyer remains dissatisfied, he or she may then appeal directly to this Court, where our review is "upon the transcript of the record from the trial court, including the record of the evidence presented to the hearing panel." *Id.* (quoting *Walwyn v. Bd. of Pro. Resp.*, 481 S.W.3d 151, 162 (Tenn. 2015)). In reviewing the decision of a disciplinary hearing panel, this Court employs the same standard of review as the trial court; we may not reweigh the evidence or substitute our judgment for that of the hearing panel. *Id.* Under Rule 9, § 33.1(b), a reviewing court may reverse or modify a hearing panel's decision only:

> if the rights of the party filing the Petition for Review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly

---

[9] The reviewing court may take additional proof "[i]f allegations of irregularities in the procedure before the hearing panel are made." Tenn. Sup. Ct. R. 9, § 33.1(b). No such allegations were made in this case.

- 14 -

unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in light of the entire record.

*See also Bd. of Pro. Resp. v. MacDonald*, 595 S.W.3d 170, 181 (Tenn. 2020) ("Absent these limited circumstances, the hearing panel's decision should not be disturbed on appeal." (quoting *Hancock v. Bd. of Pro. Resp.*, 447 S.W.3d 844, 850 (Tenn. 2014))). As in all cases, we review questions of law de novo with no presumption of correctness. *Barry*, 545 S.W.3d at 420.

## ANALYSIS

As a threshold question, Mr. Harris takes issue with the standard of proof. He contends that the petition for discipline accused him of a criminal act, namely perjury, and that disciplinary counsel at his hearing "inflated these charges to criminal aggravated perjury." Mr. Harris concedes that the hearing panel declined to determine whether Mr. Harris's testimony constituted perjury.[10] However, he suggests that it effectively found him guilty of the crime of perjury, so it should be held to the "beyond a reasonable doubt" standard of proof used in criminal trials.

This argument is without merit. As this Court has repeatedly held, attorney disciplinary proceedings are not criminal proceedings. *See, e.g.*, *In re Sitton*, 618 S.W.3d 288, 295 (Tenn. 2021) ("Attorney disciplinary proceedings are not criminal proceedings . . . ."); *Green v. Bd. of Pro. Resp.*, 567 S.W.3d 700, 715 (Tenn. 2019) ("[D]isciplinary hearings are not criminal trials and do not include all the due process protections that apply in criminal trials." (citing *Moncier v. Bd. of Pro. Resp.*, 406 S.W.3d 139, 157 (Tenn. 2013))); *Walwyn*, 481 S.W.3d at 171. Rather, the burden is on the Board to establish rule violations by a preponderance of the evidence. Tenn. Sup. Ct. R. 9, § 15.2(h). The hearing panel's decision in this case need not be supported by proof beyond a reasonable doubt.

We go on to consider the issues raised on appeal. First, Mr. Harris contends that the hearing panel's conclusion that he violated RPC 8.4(c) is arbitrary and capricious and is unsupported by substantial and material evidence. Second, Mr. Harris argues that the

---

[10] As acknowledged by Mr. Harris, the hearing panel's order states: "While such conduct may or may not constitute the crime of perjury, intentional omissions designed to conceal relevant information fairly called for in the questions is 'conduct involving dishonesty, fraud, deceit, or misrepresentation.'" Thus, the hearing panel correctly focused its attention on Mr. Harris's conduct and the standard to which he and all attorneys are held, not on whether he was guilty of an uncharged crime. *Cf. Att'y Grievance Comm'n. v. Hekyong Pak*, 929 A.2d 546, 567 (Md. 2007) ("Perjury may, generally, consist of misrepresentations, but not all misrepresentations are perjurous.").

- 15 -

sanction, a one-year suspension, is unduly harsh and an abuse of the hearing panel's discretion. We consider each issue in turn.

## Rule Violation

Similar to the argument made below, Mr. Harris's primary argument to this Court is that his testimony was truthful in the context of the specific questions he was asked. In that way, he contends, the hearing panel's conclusion that he violated RPC 8.4(c) is unsupported by substantial and material evidence and is otherwise arbitrary and capricious.

In applying the substantial and material evidence test, we determine whether the hearing panel's decision is "supported by such relevant evidence as a rational mind might accept to support a rational conclusion." *Beier v. Bd. of Pro. Resp.*, 610 S.W.3d 425, 438 (Tenn. 2020) (quoting *Bd. of Pro. Resp. v. Allison*, 284 S.W.3d 316, 322 (Tenn. 2009)). We look at whether the record contains a "reasonably sound factual basis" for the hearing panel's decision. *Id.* (quoting *Hoover v. Bd. of Pro. Resp.*, 395 S.W.3d 95, 103 (Tenn. 2012)). A reasonably sound basis is less than a preponderance of the evidence but more than a scintilla or glimmer." *Id.* (quoting *Allison*, 284 S.W.3d at 322). To the extent that the hearing panel's findings hinged on its assessment of Mr. Harris's credibility, we note that credibility and the weight given to evidence are questions of fact. Our standard of review requires us to give deference to the factual findings made by the hearing panel. *Sitton*, 618 S.W.3d at 298 ("[T]he court shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact." (quoting Tenn. Sup. Ct. R. 9, § 33.1(b))).

In this appeal, Mr. Harris insists his testimony was truthful and he had no intent to deceive. He maintains that his interpretation of the word "draw" was accurate given the firm's typical practices. He reiterates that he was going to disclose his receipt of the $225,000 check, but the juvenile court's ruling against his lawyer's line of questioning prevented him from doing so.[11]

---

[11] Mr. Harris asserts that the juvenile court would not have considered the $225,000 check had he disclosed it because the court had, in the past, always relied on his tax returns. It is unclear whether Mr. Harris is claiming that the $225,000 was not relevant to the question of whether his child support obligation should be reduced, an assertion that is plainly not accurate, or whether he is arguing that his failure to disclose was harmless error. Regardless, Mr. Harris's decision not to disclose the $225,000 took that choice away from the juvenile court judge. Mr. Harris also asserts that the Board should have asked the juvenile court judge whether he believed Mr. Harris had testified untruthfully. Respectfully, it is not the job of the juvenile court judge to ascertain whether Mr. Harris's testimony violated the Rules of Professional Conduct. Likewise, our role on appeal is to determine whether the hearing panel's decision is supported by substantial

RPC 8.4(c) states that it is "professional misconduct" for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." In this case, our review of whether Mr. Harris violated this rule is based on largely undisputed facts. First, it is undisputed that Mr. Harris received and personally deposited the $225,000 check before he gave his testimony in the juvenile court proceeding. As the hearing panel pointed out, once Mr. Harris received this check, he exercised total control over the funds and could save or spend them as he wished.

Second, because Mr. Harris's testimony is transcribed, there is no dispute about the questions posed to him and what Mr. Harris said and, perhaps more importantly, did not say in response. We know that when Mr. Harris was asked in his deposition about his "draw," counsel for the mother defined "draw" as "you get to get money out of the law firm." Despite the breadth attributed to the term, Mr. Harris claimed he had "not drawn anything from the firm with the single exception of my child support. I have not drawn a penny from [his law firm] in the last five months"—later corrected to four months. The hearing panel rightly concluded that any objective observer would have understood Mr. Harris's answer to mean that he had not received any money from his law firm in the previous four months, which was contrary to the actual facts.

Likewise, in the juvenile court hearing, when asked about any "draw" he had taken, Mr. Harris said his draw was limited to the child support checks sent to his child's mother. The hearing panel rightly rejected Mr. Harris's assertion that he did not have to disclose the $225,000 because he felt it was technically not a "draw." Neither opposing counsel nor the juvenile court judge could have guessed Mr. Harris's Byzantine rationale—"hair-splitting" as the hearing panel aptly put it—for not telling them about the $225,000 in response to repeated inquiries about money he had received from his law firm. The hearing panel accurately described Mr. Harris's testimony as appearing to have been "carefully crafted to aim for literal truth in only the narrowest sense, while omitting key information highly relevant to the issues."

Importantly, this misleading testimony was given by an experienced and accomplished lawyer, someone who should have been well-acquainted with a lawyer's "special obligations to demonstrate respect for the law and legal institutions." Tenn. Sup. Ct. R. 8, RPC 8.4, cmt. [9]. As noted by the trial judge, even if Mr. Harris genuinely viewed the $225,000 as a "distribution" and not a "draw," he still had a duty to disclose it.

---

and material evidence, not to speculate about what testimony could possibly have been elicited from persons not called as witnesses.

The trial judge put it succinctly: "[A]n experienced and accomplished lawyer should know better than to omit information highly relevant to the issues before a court."

We agree. "Membership in the bar is a privilege burdened with conditions." *Theard v. United States*, 354 U.S. 278, 281 (1957) (quoting *In re Rouss*, 116 N.E. 782, 783 (N.Y. 1917) (Cardozo, J.)); *see also Flowers v. Bd. of Pro. Resp.*, 314 S.W.3d 882, 898 (Tenn. 2010) ("[W]e subscribe to Chief Justice Cardozo's view that '[m]embership in the bar is a privilege burdened with conditions.'" (second alteration in original)). Lawyers are officers of the legal system who have a "special responsibility for the quality of justice." Tenn. Sup. Ct. R. 8, pmbl., cmt. [2].

"Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir. 1993). The adversarial process must be "directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition." *Id.* As officers of the court, lawyers "have the first line task of assuring the integrity of the process. . . . The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." *Id.* at 457–58.

Consequently, lawyers have a duty to do more than simply refrain from committing perjury. *See, e.g.*, *In re Lamont*, 561 N.W.2d 650, 654 (N.D. 1997) ("While our perjury and false statement statutes set out the standards which apply generally to all witnesses in judicial proceedings, attorneys are officers of the court and must be held to a higher standard." (citations omitted)). A lawyer's general duty of candor to the courts includes not only the duty to refrain from knowing misrepresentations but also a positive duty to disclose to the court all material facts. *See Dunlap v. Bd. of Pro. Resp.*, 595 S.W.3d 593, 613 (Tenn. 2020) (attorney's failure to disclose material information to the court violated duty of candor under RPC 3.3 and was a misrepresentation under RPC 8.4); *Beard v. Bd. of Pro. Resp.*, 288 S.W.3d 838, 855–56 (Tenn. 2009) (attorney's knowing failure to correct an error discovered after the filing of a proposed order violated RPC 3.3, 3.4, and 8.4); *accord Gum v. Dudley*, 505 S.E.2d 391, 401 (W. Va. 1997) ("[T]he general duty of candor requires attorneys be honest and forthright with courts; that attorneys refrain from deceiving or misleading courts either through direct representations or through silence; and this duty is owed to courts during all aspects of litigation."); *see also* Robert Gilbert Johnston & Sara Lufrano, *The Adversary System as A Means of Seeking Truth and Justice*, 35 J. Marshall L. Rev. 147, 150–51 (2002).

Lawyers have no less obligation to meet these standards in litigation where they are personally involved.  In *all* circumstances, a lawyer's conduct must "further the public's understanding of and confidence in the rule of law and the justice system because legal institutions in a constitutional democracy depend on popular participation and support to maintain their authority."  Tenn. Sup. Ct. R. 8, pmbl., cmt. [7].

By this measure, Mr. Harris's testimony in the juvenile court proceedings fell well short of our ethical standards for lawyers.  The Supreme Court of New Mexico put it well:

> A lawyer who makes false statements, tells half-truths, and otherwise attempts to mislead harms the legal system and the legal profession.  The essential aim of our legal system is to seek truth in the pursuit of justice; for a lawyer, all other duties and responsibilities are secondary.  Thus, a lawyer who subordinates truth to obtaining a successful outcome for a client or to avoiding personal responsibility undermines the rule of law and erodes public trust and confidence in the legal system.  We must demand better from each other.

*In re Dixon*, 435 P.3d 80, 88 (N.M. 2019) (citation omitted).

We do demand better.  We find substantial and material evidence in this record to support the decisions of the hearing panel and the trial court that Mr. Harris's testimony in the juvenile court proceedings violated RPC 8.4(c), so we affirm those decisions.

**Sanction**

We next address Mr. Harris's argument that the hearing panel abused its discretion by imposing a one-year suspension.  A hearing panel abuses its discretion when it "appl[ies] an incorrect legal standard or reach[es] a decision which is against logic or reasoning that causes an injustice to the party complaining." *Meehan v. Bd. of Pro. Resp.*, 584 S.W.3d 403, 413 (Tenn. 2019) (alterations in original) (quoting *Bd. of Pro. Resp. v. Reguli*, 489 S.W.3d 408, 418 (Tenn. 2015)).

Mr. Harris does not challenge the hearing panel's findings that ABA Standard 6.11 applies and the presumptive sanction is disbarment, nor does he challenge the trial court's affirmance of those findings.  He acknowledges the standard of review applicable to the hearing panel's sanction decision.  Nevertheless, he asks this Court to exercise broader "discretion to override and lessen the findings of the hearing panel" because the proposed sanction is too severe.

- 19 -

As noted above, this Court has the fundamental right and inherent power to enforce the rules governing the practice of law in this State. *See Thompson v. Bd. of Pro. Resp.*, 600 S.W.3d 317, 320 (Tenn. 2020). Nevertheless, as Mr. Harris must acknowledge, our standard of review is the same as that of the trial court.[12] *Reguli*, 489 S.W.3d at 417. Consequently, we will uphold a sanction imposed by a hearing panel "where reasonable minds can disagree over [its] propriety." *Bd. of Pro. Resp. v. Sheppard*, 556 S.W.3d 139, 146 (Tenn. 2018) (citing *Sallee v. Bd. of Pro. Resp.*, 469 S.W.3d 18, 42 (Tenn. 2015)).

Mr. Harris contends next that a one-year suspension could only be justified in a case involving perjury or other criminal conduct. As we have already pointed out, we need not determine whether Mr. Harris's conduct would violate criminal statutes; attorney disciplinary proceedings are not criminal proceedings. *See Nevin v. Bd. of Pro. Resp.*, 271 S.W.3d 648, 657 (Tenn. 2008) ("[T]here is no requirement that an attorney's actions be criminal before a suspension may be imposed." (citing *Sneed v. Bd. of Pro. Resp.*, 37 S.W.3d 886, 891 (Tenn. 2000))). More severe sanctions than that imposed on Mr. Harris, including disbarment, have been meted out irrespective of whether the attorney's conduct was criminal. *See, e.g.*, *Bd. of Pro. Resp. v. Justice*, 577 S.W.3d 908, 932 (Tenn. 2019). This argument is without merit.

Mr. Harris asks us to consider several mitigating factors rejected by the hearing panel and the trial court. He asks us to find that lack of harm to a client, Mr. Harris's cooperation with the BPR, substantial delay in the proceedings, and the emotional toll on Mr. Harris of the disciplinary proceedings are additional mitigating factors that should be applied to decrease the sanction in this case.

The hearing panel found that lack of harm to a client should not be a mitigating factor where there was harm to others. We agree. Indeed, the absence of a client in this case actually highlights Mr. Harris's selfish motive; after the hearing on his juvenile court petition, Mr. Harris was able to keep more of his income and pay less to his child's custodian.[13] The hearing panel found that neither Mr. Harris's cooperation with the

---

[12] Mr. Harris cites *Board of Professional Responsibility v. Curry*, 266 S.W.3d 379 (Tenn. 2008), but that case is distinguishable. *Curry* "straddle[d]" a change in the rules, and for that reason, a different standard of review applied. *See id.* at 387–89.

[13] Mr. Harris asserts that, after the death of his child's mother, he counseled the child's guardian to apply for Social Security benefits under his name instead of under the name of the child's mother to increase the child's benefits. He asserts that he continued to pay the (reduced) child support even after the child began receiving Social Security benefits. Assuming the truth of these assertions, they do not change the

disciplinary inquiry nor the delay in the proceedings should be considered mitigating factors; it observed that the delay was agreed-upon and that cooperation, while commendable, is not a mitigating factor. We agree with this conclusion as well. The hearing panel acknowledged the disciplinary proceedings had taken a toll on Mr. Harris and observed that child support disputes in general can be emotionally charged, but nevertheless determined that the emotional toll did not rise to the level of a mitigating factor. We find no fault in the hearing panel's analysis.[14]

Overall, we find no abuse of the hearing panel's discretion in discerning the appropriate aggravating and mitigating factors and weighing them in its sanction decision.[15] Accordingly, we agree with the trial court that the hearing panel did not abuse its discretion by giving Mr. Harris a one-year suspension, and we affirm its judgment upholding that sanction.

CONCLUSION

For the reasons stated above, we hold that the hearing panel's finding that Mr. Harris violated RPC 8.4(c) is supported by substantial and material evidence and is not arbitrary

---

fact that Mr. Harris's decision not to disclose the $225,000 check to the juvenile court was motivated by his desire to reduce his monthly child support obligation.

[14] The hearing panel also rejected several aggravating factors put forth by the Board, specifically, pattern of dishonesty, refusal to acknowledge wrongful nature of conduct, and illegal conduct.

[15] We find the disciplinary cases cited by Mr. Harris inapposite. Three did not involve conduct that included "dishonesty, fraud, deceit, or misrepresentation" to a court. *See Bd. of Pro. Resp. v. Daniel*, 549 S.W.3d 90, 107 (Tenn. 2018) (modifying a three-year suspension to be served entirely on probation to include one year of active suspension for an attorney whose misappropriation of funds did not result in harm to a client); *Allison*, 284 S.W.3d at 328 (agreeing with the hearing panel that a sixty-day suspension was appropriate for an attorney with prior disciplinary history); *Bd. of Pro. Resp. v. Maddux*, 148 S.W.3d 37, 42 (Tenn. 2004) (affirming a thirty-day suspension for an attorney who converted funds from his law firm but lacked criminal intent). Another involved misrepresentation to a court, but the hearing panel did not determine whether the attorney's misrepresentation reflected knowing misconduct or gross negligence. *Nevin*, 271 S.W.3d at 658. Here, the hearing panel found that Mr. Harris engaged in "intentional omissions designed to conceal relevant information." The last case on which Mr. Harris relies, *Dunlap v. Board of Professional Responsibility*, involved a different ABA standard, 6.12, with a lower presumptive sanction of suspension. *See* 595 S.W.3d at 613. The hearing panel in this case could have applied a different presumptive sanction to Mr. Harris's conduct, as was done in *Dunlap*, but its decision not to was a permissible choice, not an abuse of discretion. *See Daniel*, 549 S.W.3d at 102 (noting that where multiple standards with different presumptions might apply, a hearing panel may select from within the range identified by the relevant standards). We respectfully reject Mr. Harris's arguments based on these cases.

and capricious.  Similarly, we hold that the hearing panel's imposing a one-year active suspension from the practice of law does not represent an abuse of discretion.  We affirm the decision of the hearing panel and that of the trial court.

Costs of this appeal are assessed against Appellant Tyree B. Harris, IV, for which execution may issue if necessary.


_____
HOLLY KIRBY, JUSTICE